J-S08015-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: A.J.G., A/K/A A.P., A/K/A A.J.M.G. | ⋮ | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | ⋮ | |
| APPEAL OF: T.Y., NATURAL FATHER | ⋮ | No. 1269 WDA 2015 |

Appeal from the Decree entered August 17, 2015,
in the Court of Common Pleas of Allegheny County, Orphans' Court,
at No: CP-02-AP-000045-2015

BEFORE:  STABILE, DUBOW, and MUSMANNO, JJ.

MEMORANDUM BY STABILE, J.: **FILED FEBRUARY 29, 2016**

T.Y. (Father) appeals from the decree entered August 17, 2015, in the Court of Common Pleas of Allegheny County, which involuntarily terminated Father's parental rights to his minor daughter, A.J.G., a/k/a A.P., a/k/a A.J.M.G. (Child), born in October of 2013.[1]  We affirm.

The orphans' court summarized the factual and procedural history of this matter as follows.

> [Child] came into the care of Allegheny County Children Youth and Families (CYF) on October 28, 2013[,] due to Mother's drug and alcohol, mental health, domestic violence, and housing issues.  At the time of [Child's] birth, CYF had concerns regarding Mother's stability, as her three other children were in CYF's care, Mother had yet to address her Family Service Plan (FSP) goals and had only just received unsupervised visitation with those children.
>
> CYF filed a dependency petition on October 31, 2013, and [Child] was adjudicated dependent on November 22, 2013. Following the adjudicatory hearing, [the orphans' court] ordered

---

[1] The decree also terminated the parental rights of Child's mother, K.P. (Mother).  Mother is not a party to the instant appeal.

Mother and Father to appear for genetic testing. Although[] Mother's paramour, A.G., had signed an acknowledgement of paternity prior to the adjudicatory hearing, paternity was not established at the adjudicatory hearing because Mother identified [Father] as the child's natural father and neither Mother nor A.G. informed the [orphans' c]ourt of the signed acknowledgement. In fact, it wasn't until February, 2014 that Mother and A.G. registered the acknowledgment of paternity. Unfortunately, Father failed to appear for the genetic testing, so A.G. was legally established as the father once the acknowledgment of paternity was registered. However, CYF and the [orphans' court] were unaware of this registration, and CYF continued to treat [Father] as the natural father, sending him notices of all court proceedings via first class mail.

From October, 2013 until September, 2014, [Father] did not attempt to reunify with [Child] whatsoever. Despite speaking with the caseworker about the November 22, 2013 adjudicatory hearing and receiving proper service of the August 1, 2014 aggravated circumstances hearing, Father made no efforts to contact CYF to begin reunification efforts or establish visitation with his daughter. Only after Father reunified with his other daughter, E.Y., and was sued for child support of [Child], did Father contact the caseworker regarding [Child]. Still unaware of the establishment of A.G. as father, CYF requested a second order for genetic testing. [The orphans' court] then entered a second order for genetic testing on October 17, 2014. Upon receiving the genetic test results that identified [Father] as the natural [f]ather, [the orphans' court] disestablished paternity as to A.G. on February 6, 2015. However, due to Father's inaction for the eleven months [Child] remained in care, CYF filed a petition to terminate his rights on February 13, 2015.

Orphans' Court Opinion, 10/26/2015, at 1-3 (unpaginated) (footnotes omitted).

A termination hearing was held on June 29, 2015, during which the orphans' court heard the testimony of CYF caseworker, Bonnie Antonucci; Mother; psychologist, Neil Rosenblum, Ph.D.; Father; and CYF caseworker, Larry Walter. On August 17, 2015, the court entered its decree terminating

Father's parental rights to Child involuntarily. Father timely filed a notice of appeal on August 18, 2015, along with a concise statement of errors complained of on appeal.

Father now raises the following issue for our review. "Whether the [orphans'] court erred in determining that CYF has established grounds to terminate [F]ather's parental rights pursuant to 23 Pa.C.S.[A.] [§] 2511(a)(2)[?]" Father's brief at 4.

We consider Father's claim mindful of our well-settled standard of review.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing

evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the orphans' court terminated Father's parental rights pursuant to Sections 2511(a)(2) and (b), which provide as follows.

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\*\*\*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\*\*\*

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions

described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted)). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

Instantly, the orphans' court found that Father's parental incapacity has left Child without essential parental care, control, or subsistence, and that Father cannot, or will not, remedy his incapacity. Orphans' Court Opinion, 10/26/15, at 3-7 (unpaginated). The court reasoned that Father refused to parent Child for the first year of her life, and that Father is unable to understand the impact that his refusal has had on Child's physical and mental well-being. *Id.* at 3-5, 7. The court also emphasized that Child is bonded with her foster parents, and that Child's ability to establish a parent/child bond with Father would depend on Father's level of emotional

investment and maturity. *Id.* at 6-7. According to the court, Father's actions demonstrate that he does not possess the emotional investment or maturity necessary to parent Child. *Id.*

Father argues that he was "duped by Mother into believing that [Child] was not his daughter," and that he sought to develop a relationship with Child upon discovering that he was her father. Father's brief at 7, 11. Father insists that his efforts were "thwarted" by CYF. *Id.* at 7, 9-10. Father emphasizes that he did not receive notice of any court proceedings from November of 2013 until June of 2014, due to the notice being sent to an incorrect address. *Id.* at 5-6, 9-10. Father also notes that he succeeded in having his other daughter, E.Y., returned to his care in August of 2014. *Id.* at 11-12.

After a thorough review of the record in this matter, we conclude that the orphans' court did not abuse its discretion by terminating Father's parental rights to Child involuntarily. During the termination hearing, CYF caseworker, Bonnie Antonucci, testified that she spoke with Mother around the time Child first was placed in foster care, and that Mother informed her that Father was Child's father. N.T., 6/29/2015, at 49. Ms. Antonucci called Father on October 30, 2013, and asked Father if he signed an acknowledgement of paternity. *Id.* at 49-51. Father reported to Ms. Antonucci that he was unable to sign an acknowledgement because Mother would not let him do so. *Id.* at 51. However, Father "stated that he knows

he's the father of [Child]." *Id.* Father also reported that "he would be moving to McKees Rocks soon and would be able to care f[o]r [Child] then." *Id.*

Ms. Antonucci further testified that she sent notice of the various hearings in Child's case to the address that she had on file for Father. *Id.* at 51-52. However, her notices were being returned as undelivered. *Id.* at 52. Ms. Antonucci contacted the caseworker in E.Y.'s case, but he had no contact with Father and did not know where Father was. *Id.* at 71. Ms. Antonucci conducted additional searches for Father's address in February of 2014, but the searches provided the same address that Ms. Antonucci already was using. *Id.* at 59. In April of 2014, Ms. Antonucci learned from the caseworker in E.Y.'s case that Father was living at a different address, and she began sending notice there.[2] *Id.* at 52.

Ms. Antonucci explained that Father was reunited with his other daughter, E.Y., on August 20, 2014. *Id.* at 61. Ms. Antonucci stated that Father "always said that when he got [E.Y.] back, . . . he would call me to start working on having [Child] placed with him." *Id.* Sure enough, Father called Ms. Antonucci on September 9, 2014, and asked what he would need to do in order to gain custody of Child. *Id.* at 61-63. Ms. Antonucci asked what Father had been doing for the last year, and Father explained that he

---

[2] Counsel for CYF and counsel for Father agreed that everything sent to Father between the end of October of 2013 and mid-June of 2014 came back undelivered. N.T., 6/29/2015, at 56.

had been working on regaining custody of E.Y. *Id.* at 64. Since September of 2014, Father has made consistent contact with CYF and requested visits. *Id.* at 76. Father has had three visits with Child. *Id.* at 85.

Ms. Antonucci explained that Father's FSP objectives at the start of the case were to contact CYF and complete an assessment. *Id.* at 66. Father's objectives later were updated to include "drug screens, eliminate family abuse, visit [Child], comply with mental health services, [and] compliance." *Id.* Ms. Antonucci agreed that Father successfully completed similar FSP objectives in E.Y.'s case. *Id.* at 81, 83. However, CYF was not satisfied that Father had completed his drug and alcohol objective in Child's case. *Id.* at 68. Father completed an outpatient drug and alcohol treatment program on October 27, 2014, but "[h]is drug screens were not consistent and they were not clean. And there were concerns that he didn't go to the intensive outpatient." *Id.*

CYF caseworker, Larry Walter, testified that he was assigned to E.Y.'s case in May of 2014. *Id.* at 135. E.Y. was placed in CYF's care in August of 2012, but Father did not contact CYF in an effort to regain custody of E.Y. until April of 2014. *Id.* at 137. Prior to being returned to Father, E.Y. was residing in the home of her paternal grandmother. *Id.* at 138. CYF wanted to remove E.Y. from the paternal grandmother's care "for a variety of reasons," and have her placed in a foster home. *Id.* at 138. The dependency court instead placed E.Y. with Father. *Id.*

Psychologist, Neil Rosenblum, Ph.D., testified that he conducted an interactional evaluation of Child and her foster parents in December of 2014, as well as an interactional evaluation of Child and Father, and an individual evaluation of Father. *Id.* at 89, 91, 93. Dr. Rosenblum reported that Child appears to be receiving "outstanding care and attention" from her foster parents. *Id.* at 90. Child "has developed a very strong primary attachment and close emotional attachment to [her] foster parents." *Id.* at 91. Dr. Rosenblum noted that Father was "very appropriate" with Child during the evaluation, and that he "did a very reasonable job of playing and interacting with her." *Id.* at 92-93. However, Dr. Rosenblum stated it would be difficult for Child to "reattach" to Father, given their lack of a prior relationship. *Id.* at 98. Dr. Rosenblum opined that it would possible for a child in Child's situation to reattach to a new caregiver, but the success of such an endeavor would depend on, *inter alia*, the caregiver's level of maturity and emotional investment. *Id.* at 100.

Dr. Rosenblum further reported that Father has a history of anti-social behavior, and possesses anti-social personality traits. *Id.* at 96. Dr. Rosenblum explained Father's anti-social personality as follows: "It essentially points to the pattern again of impulsive behavior, violation of rules. Won't be taking ownership or responsibility for one's behavior. Sporadic conflict with other people and often a pattern of irritability and aggressiveness and lack of responsibility or concern of safety or well-being

of others." *Id.* Father admitted to Dr. Rosenblum that he has a history of consistent marijuana use, and that he has experimented with other drugs as well. *Id.* Father denied that his drug use interfered with his lifestyle, his ability to work, or his relationships with others, but stated that he became drug free so that he could regain custody of E.Y. *Id.* at 94-97.

In addition, Dr. Rosenblum stated that he discussed the history of this case with Father. *Id.* at 93. Father stated to Dr. Rosenblum that he "knew that there was a good possibility" that Child was his child. *Id.* Father was aware that Mother had been in a relationship with another man at the time Child was conceived, "but he seemed to believe that that individual was incarcerated at the time . . . ." *Id.* Father informed Dr. Rosenblum that he did not pursue reunification with Child because "he was busy working on reunification with his other daughter," and because he was "busy with work . . . ." *Id.* at 94. Dr. Rosenblum read from a portion of his report, in which he indicated that Father "doesn't see any relevance for the fact that he waited close to a year before trying to initiate visitation with [Child]. He automatically assumes because [Child] is his daughter, that she will quickly begin relating to him quite well." *Id.* at 105 (quoting CYF Exhibit 3 at 5).

Father testified that he was "kind of convinced" that Child was his daughter when he arrived at the hospital after her birth. *Id.* at 123. Father believed he was Child's father because Child resembled him. *Id.* at 110. However, Mother told Father that he was not Child's Father. *Id.* at 109.

Mother identified two other men who she said were more likely to be the father. *Id.* at 123. Father recalled that Mother sent a picture of Child's birth certificate to Child's paternal grandmother in December of 2013, and that the certificate listed A.G. as Child's father. *Id.* at 123-24. According to Father, Mother also claimed that a DNA test proved that A.G. was Child's father. *Id.* at 123, 131. Father stated that it was "kind of hard to believe that [A.G.] was the father, but DNA tests don't lie." *Id.* at 124. Father called CYF and asked for a DNA test after he received child support paperwork in August of 2014. *Id.* at 124-25.

Concerning his FSP objectives, Father admitted that he has tested positive for marijuana on two occasions since completing a drug and alcohol program. *Id.* at 116-17. Father claimed that he has smoked marijuana only once since completing the program, and that the second positive screen resulted from a "THC brownie" that he inadvertently consumed while at work. *Id.* Father also stated that the positive screen may have resulted from someone smoking marijuana in close proximity to him. *Id.* at 117.

Thus, the record supports the finding of the orphans' court that Father's parental incapacity has left Child without essential parental care, control, or subsistence. Moreover, Father cannot, or will not, remedy his incapacity. At the time Child was born in October of 2013, Father knew, or

should have known, that Child was his daughter.[3]  While Father complains that CYF "thwarted" his attempts at being reunited with Child, Father failed to make any such attempts for nearly the first year of Child's life. Further, while Father protests that he did not receive notice of any court proceedings between November of 2013 and June of 2014, it was Father who failed to notify CYF that he had moved, and it was Father that failed to provide CYF with his correct address.  If Father wanted to develop a relationship with Child, he could have reached out to CYF, corrected his address, and involved himself in the proceedings at the time they commenced in the fall of 2013. Instead, Father abandoned Child until he regained custody of E.Y. and was sued for child support.[4]

This Court has emphasized that "'[p]arental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.'"  *In re E.A.P.*, 944 A.2d 79, 83 (Pa. Super. 2008) (quoting *In re B.,N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004), *appeal denied*, 872 A.2d 1200 (Pa. 2005)).  Here, Father's decision to delay

---

[3] As observed by the orphans' court, even if Mother did claim that a DNA test proved that A.G. was Child's father, Father made no effort to confirm that this was actually true.  *See* Orphans' Court Opinion, 10/26/2015, at 5 (unpaginated).

[4] We note that "evidence concerning a parent's ability to care for another child is irrelevant and inadmissible in a proceeding to terminate parental rights with regard to the child at issue."  *See A.L.D.*, 797 A.2d at 338 (citations omitted).

parenting Child until it was more convenient for him confirms the determination of the orphans' court that Father lacks the maturity and emotional investment necessary to bond with, and care for, Child. Tellingly, the court asked Father during the termination hearing why he thought it would be in Child's best interest to be placed in his care, after Child had no relationship with Father for so long. N.T., 6/29/15, at 133-34. Father did not respond that he would be a good parent for Child, or even that he wants to parent Child. Instead, Father responded, "Because when she grows up she and asks who her father is, they are not going to be able to say it in English."[5] *Id.* at 134.

Accordingly, because we conclude that the orphans' court did not abuse its discretion by involuntarily terminating Father's parental rights to Child pursuant to Section 2511(a)(2), we affirm the decree of the orphans' court.[6]

Decree affirmed.

---

[5] Child's foster parents are citizens of France and speak to her almost exclusively in French. N.T., 6/29/15, at 90.

[6] Because Father only challenges the orphans' court's analysis with respect to Section 2511(a)(2), we need not consider whether the court abused its discretion by finding that termination was warranted under Section 2511(b). *See In re Adoption of R.K.Y.*, 72 A.3d 669, 679 n.4 (Pa. Super. 2013), *appeal denied*, 76 A.3d 540 (Pa. 2013) (declining to address Section 2511(b) where the appellant did not make an argument concerning that section).

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/29/2016