944 A.2d 79 (2008)
In re Involuntary Termination of Parental Rights to E.A.P., a Minor.
Appeal of D.P., Biological Mother.
No. 2119 EDA 2007.
Superior Court of Pennsylvania.
Submitted November 5, 2007.
Filed February 26, 2008.
*81 Shannon S. Piergallini-Smith, Allentown, for appellant.
Jane D. Davenport, Allentown, for appellee.
Kathryn E. Roberts, Allentown, for J.E.P., Participating Party.
Valerie S. Cammarene and Kathleen M. Willianson, Allentown, for Lehigh County Office of Children and Youth Services, Participating Party.
BEFORE: KLEIN, BENDER and POPOVICH, JJ.
OPINION BY KLEIN, J.:
¶ 1 D.P. (Mother) appeals from the order entered in the Court of Common Pleas of Lehigh County terminating her parental rights to her daughter, E.A.P., born September 6, 1997.[1] Mother raises two issues: (1) whether the trial court erred in determining that Lehigh County Office of Children and Youth Services (LCCYS) met its burden of proving by clear and convincing evidence that the statutory standards in 23 Pa.C.S.A. § 2511(a)(1) and (a)(2) had been met;[2] and (2) whether the court erred in determining that LCCYS met its burden of proving by clear and convincing evidence that termination best meets the needs and welfare of the child as required by 23 Pa.C.S.A. § 2511(b).[3]
¶ 2 After review, we conclude that the record supports the trial court's findings that: (1) Mother has been repeatedly incarcerated for most of E.A.P.'s life; (2) despite Mother's participation in various prison programs and cooperation with LCCYS, her sex offender status has prevented her from fostering a continued and close relationship with E.A.P., and (3) there is no bond between Mother and E.A.P. President Judge Alan M. Black, therefore, properly terminated Mother's parental rights.
Facts
¶ 3 E.A.P. was first adjudicated dependent on April 27, 1998. She was seven months old at that time. Mother and E.A.P. resided with maternal grandmother (Grandmother). Four months later Mother was incarcerated for probation violations and charges of forgery. Following a review hearing on April 29, 1999, the dependency *82 order was vacated and E.A.P. was placed in the custody of Grandmother. Since that time, Mother was incarcerated four more times, on charges of forgery, theft by deception, escape and indecent assault on a fourteen-year-old boy. E.A.P. lived with Grandmother for seven years.
¶ 4 E.A.P. is now ten years old; since the time that E.A.P. was first adjudicated dependent, Mother has been out of prison for a total of 17 months. Mother has been continuously incarcerated since September 2004.
¶ 5 In June 2005, because of E.A.P.'s disruptive behavior, and at Grandmother's request, E.A.P. was placed in foster care.[4] E.A.P., who suffers from various emotional disorders, including ADHD combative type, oppositional defiance disorder and posttraumatic stress disorder, was placed in a therapeutic foster home in January 2005.
¶ 6 At a final review hearing on November 2, 2006, the permanency goal was changed to adoption. At the time of the termination hearing, Mother had not lived with E.A.P. for five years and E.A.P. had been in six different foster homes. Mother has participated in various programs in prison, including required sex offender treatment. Mother's maximum prison release date is March 2009, and even if she is paroled before that time she may not be a viable resource for E.A.P. because of her untreated sex offender status. The court found that at her current pace, Mother, who is a registered sex offender, would not complete sex offender treatment until March 2009, her maximum release date.
Discussion
¶ 7 Parental rights may be terminated under Section 2511(a)(2) if three conditions are met: "(1) repeated and continued incapacity, abuse, neglect or refusal must be shown; (2) such incapacity, abuse, neglect or refusal must be shown to have caused the child to be without essential parental care, control or subsistence; and (3) it must be shown that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." In re Geiger, 459 Pa. 636, 331 A.2d 172, 174 (1975).
¶ 8 Unlike subsection (a)(1), subsection (a)(2) does not emphasize a parent's refusal or failure to perform parental duties, but instead emphasizes the child's present and future need for "essential parental care, control or subsistence necessary for his physical or mental well-being." 23 Pa.C.S.A. § 2511(a)(2). See In re R.I., 468 Pa. 287, 361 A.2d 294 (1976). Therefore, the language in subsection (a)(2) should not be read to compel courts to ignore a child's need for a stable home and strong, continuous parental ties, which the policy of restraint in state intervention is intended to protect. In re William L., 477 Pa. 322, 383 A.2d 1228, 1240 (1978). This is particularly so where "disruption of the family has already occurred and there is no reasonable prospect for reuniting it . . ." Id. Further, grounds for termination under subsection (a)(2) are not limited to affirmative misconduct; those grounds may include acts of incapacity to perform parental duties. In re A.L.D., 797 A.2d 326, 337 (Pa.Super.2002).
¶ 9 Although incarceration will certainly impact a parent's capability of performing parental duties, and may render a parent incapable of performing parental duties under subsection (a)(2), incarceration alone is not sufficient to support termination under any subsection. See In re C.S., 761 A.2d 1197, 1201 (Pa.Super.2000) (en banc); In re I.G., 2007 PA Super 394, 939 A.2d 950 (2007); In re Adoption of C.L.G., 2007 PA Super 355 *83 (2007). Likewise, a parent's incarceration does not preclude termination of parental rights if the incarcerated parent fails to utilize given resources and to take affirmative steps to support a parent-child relationship. In re D.J.S., 737 A.2d 283 (Pa.Super.1999). Nor does it toll parental responsibilities. Adoption of McCray, 460 Pa. 210, 331 A.2d 652, 654 (1975).
¶ 10 Imprisonment is but one factor the trial court must consider in analyzing a parent's performance. While incarcerated, a parent is expected to utilize whatever resources are available to him while in prison in order to foster a continuing close relationship with his children. Adoption of Baby Boy A., 512 Pa. 517, 517 A.2d 1244, 1246 (1986). Parents are required to make diligent efforts towards the "reasonably prompt assumption of full parental responsibilities." A.L.D., 797 A.2d at 340. "Where the parent does not exercise reasonable firmness in `declining to yield to obstacles,' his [parental] rights may be forfeited." Id.
¶ 11 Here, the record does show that Mother has participated in prison programs. Mother has completed 2 of 7 phases of the required sex offender treatment, and she has completed over 52 weeks of parenting programs, including one focusing on dealing with children with ADHD. (N.T. Termination Hearing, 3/8/07, at 130-31). This is commendable, but it cannot be the decisive factor under these circumstances.
¶ 12 The caseworker, the therapist/psychiatric mental health specialist, and the child advocate each testified that E.A.P., in part due to her disorders, requires permanency and requires a caregiver who will be present for her. (N.T. Termination Hearing, 3/8/07, at 43, 56, 109, 142). This was a recurring theme at the termination hearing. As the trial court stated, "the record in this case establishes that Mother does not have the capacity to parent [E.A.P.] because of her inability to remain present in [E.A.P.'s] life." Trial Court Opinion, 6/26/07.
¶ 13 Essentially, Mother has never really provided parental care for E.A.P. Even when she was not incarcerated, E.A.P. lived with Grandmother. Though Mother resided at Grandmother's as well for part of that time, the remainder of that time was spent at the homes of friends and acquaintances while E.A.P. remained with Grandmother. (N.T. Termination Hearing, 3/08/07, at pp. 31, 33).
¶ 14 "Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs." In re B., N.M., 856 A.2d 847, 855 (Pa.Super.2004). In C.L.G., we stated:
This Court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future. Indeed, we work under statutory and case law that contemplates only a short period of time, to wit eighteen (18) months, in which to complete the process of either reunification or adoption for a child who has been placed in foster care.
2007 PA Super at *3 (citing In re Adoption of R.J.S., 901 A.2d 502 (Pa.Super.2006)).
¶ 15 Our Supreme Court has stated that "a parent desiring to retain parental rights must exert himself to take and maintain a place of importance in his child's life." See Adoption of Baby Boy A., 512 Pa. 517, 517 A.2d 1244, 1246 (1986). Here, despite Mother's cooperation with LCCYS and participation in prison programs, the situation is such that (1) Mother has been incarcerated most of E.A.P.'s life; (2) her convicted sex offender status, a situation of *84 her own making, has precluded her from forming or maintaining a relationship with E.A.P. and, (3) even if Mother is paroled, she may continue to be precluded from having contact with E.A.P. until completion of the remaining phases of treatment. See In re V.E., 417 Pa.Super. 68, 611 A.2d 1267 (1992) (when parent is separated from children, parent not only has duty to love, protect and support them, but also has duty to maintain communication and association with them). Thus, even though Mother has participated in various programs, none has fostered a "continuing close relationship" with E.A.P. This is supported in the record. Further, it is quite clear from the record that Mother has not exercised reasonable firmness in "declining to yield to obstacles." Adoption of Baby Boy A., supra.
¶ 16 Similarly, in In re Adoption of J.M.M., 782 A.2d 1024 (Pa.Super.2001), Father had a significant criminal history and had been incarcerated for nearly all of his daughter's life. At the time of the termination hearing, Father remained incarcerated but presented evidence that he participated in the prison's rehabilitative and education services. The trial court, however, determined that Father had failed to perform the parental duties he owed to his daughter, not having seen her in more than two years and having expended minimal effort attempting to create or maintain a parent-child relationship. The trial court, therefore, terminated Father's parental rights. Id. at 1030. On appeal, this Court affirmed. We stated: "Given Father's failure to perform parental duties and given that he has been unable to remain out of jail for any period of time, we agree with the trial court in terminating his parental rights." Id.
¶ 17 Each case of an incarcerated parent facing termination must be analyzed on its own facts, keeping in mind, with respect to subsection (a)(2), that the child's need for consistent parental care and stability cannot be put aside or put on hold simply because the parent is doing what she is supposed to do in prison. We acknowledge Mother's argument that she is doing everything that she is supposed to be doing. Under different facts, this might be determinative or given greater weight. Here, however, Mother has been in prison for most of the child's life. There is no relationship to speak of, and in fact the record supports the court's finding that the child does not even know Mother. (N.T. Termination Hearing, 3/8/07, at 43-44). Obviously this is due to the length and frequency of Mother's incarcerations, and more recently, her sex offender status. Mother's participation in prison programs has not altered that fact.
¶ 18 The trial court also concluded that there was no bond between Mother and E.A.P. The caseworker testified that E.A.P. "really cannot identify her mother. If her mother would come and meet with her she'd probably not even know what she looked like." (Id. at 43). The caseworker stated that "E.A.P. really does not speak to me of her mother. When she speaks to me she asks me when she's going to be adopted and have a permanent home, but she does not even make any references to her mother." (Id. at 43-44). Psychiatric mental health specialist Judith A. Matusic, E.A.P.'s therapist, testified with respect to E.A.P.'s attachment to Mother. Matusic stated: "[E.A.P.] does not remember [Mother]. She has no recollection of [Mother]." (Id. at 51). Matusic also reiterated her concerns and recommendations from a 2006 letter that she wrote to the trial court with respect to a change of goal proceeding, in particular, that she could not recommend visits between E.A.P. and Mother because essentially E.A.P. had no "emotional mother *85 attachment" with Mother. In response to whether it would benefit E.A.P. to have Mother step into "some type of role," Matusic stated that beginning any sort of contact at this point would be detrimental to [E.A.P.]. She has no recollection of [Mother] as `Mom.'" (Id. at 60-61).
¶ 19 The court, therefore, determined that termination would best serve E.A.P.'s needs and welfare. 23 Pa.C.S. § 2511(b). This, too, is supported in the record.
¶ 20 In essence, E.A.P. has no parents and her needs have been met by others for the past ten years. See In re Adoption of K.J., 2007 PA Super 337, 936 A.2d 1128 (2007) (incarceration alone does not provide sufficient grounds for termination; however parental rights are not preserved by waiting for more convenient time to perform parental responsibilities while others provide child with physical and emotional needs). It is certainly possible that come March 2009 Mother will have completed her sex offender program and may be able to be a parent to E.A.P.; however, on this record we cannot view that possibility as a "reasonable prospect." In light of this, and despite Mother's compliance, the bottom line remains that E.A.P. has been without essential parental care for more than two years, in fact for most of her life. 23 Pa.C.S.A. § 2511(a)(2). On this record, we simply cannot take the risk that E.A.P., who is specifically adoptable at present[5], should linger in foster care in the hope that Mother can or will change her conduct of the past ten years.
¶ 21 In conclusion, the record supports the trial court's determination that LCCYS established by clear and convincing evidence that Mother's repeated incarcerations and failure to be present for E.A.P. has caused E.A.P., for most of her life, to be without essential parental care, control or subsistence necessary for her physical or mental well-being, and further, that the conditions and causes of the incapacity, despite Mother's compliance with various prison programs, cannot be remedied. 23 Pa.C.S.A. § 2511(a)(2). The court's determination that there is no bond between Mother and E.A.P. and that termination would best serve E.A.P.'s needs and welfare is also supported in the record. 23 Pa.C.S.A. § 2511(b). We therefore affirm the trial court's order terminating Mother's parental rights.
¶ 22 Order affirmed.
NOTES
[1] E.A.P.'s father voluntarily relinquished his parental rights; he is not a party to this appeal.
[2] Based on our determination that LCCYS met its burden under subsection (a)(2), we need not address the issue under subsection (a)(1). We only need to agree with the court's decision on any one subsection of 23 Pa. C.S.A. § 2511(a) to affirm the termination decree. In re Adoption of K.J., 936 A.2d 1128 (Pa.Super.2007).
[3] Our scope of review is broad and comprehensive, although our standard of review is narrow. We consider all the evidence, along with the legal conclusions and factual findings of the trial court and reverse only if we find an abuse of discretion, an error of law, or insufficient evidentiary support. In re C.M.S., 884 A.2d 1284, 1286 (Pa.Super.2005).
[4] Grandmother was also caring for Mother's other three children.
[5] Essentially, E.A.P.'s caseworker testified that E.A.P. is an "adoptable" child, that despite her serious diagnoses, she's "a very bright, adorable, outgoing, friendly, lovable little girl." The caseworker stated that "through the Statewide Adoption Network she had received 20 profiles of families interested in E.A.P., families that are aware of E.A.P.'s issues, know her background and status, and are interested in becoming a permanent home for her." (N.T. Termination Hearing, 3/8/07, at 79-80). We note that the attorney for LCCYS brought out these points, as well as the fact that as E.A.P. ages, her likelihood of adoption will obviously decline. These are the realities of the adoption process and were properly considered by the trial court in evaluating the needs and welfare of the child.