J-S31031-16

## NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P 65.37

| | | |
|---|---|---|
| IN RE: S.R., A MINOR, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: W.C., FATHER | : | No. 2147 MDA 2015 |

Appeal from the Order Entered November 13, 2015
in the Court of Common Pleas of Lancaster County
Orphans' Court at No(s): 2015-0722

BEFORE:   SHOGAN, OTT, and STRASSBURGER,* JJ.

MEMORANDUM BY STRASSBURGER, J.:          **FILED MAY 24, 2016**

W.C. (Father) appeals from the decree that terminated his parental rights to his biological daughter, S.R.[1]  We affirm.

The orphans' court aptly set forth the factual and procedural history of this matter as follows.

> S.R. was born [in November of 2013]. At the time of her birth, [Mother] was incarcerated. Mother named [E.T.] as the father of S.R. and [CYS] attempted to locate him. [A] shelter care hearing was held on November 26, 2013, at which time temporary and legal custody was granted to [CYS]. [An] adjudication and disposition hearing was held on January 7, 2014.  [A] review hearing was held on April 25, 2014. [CYS] was unable to establish [E.T.'s] whereabouts during this period of time.  [S.R. was placed in the care of her foster parents, where she has remained.]
>
> On July 17, 2014, Mother reported she saw S.R.'s father in Lancaster and he gave her his number and address. Mother then gave [CYS] his contact information, explaining that his correct name was [W.C.] and that [E.T.] was the false name he had

---

[1] Mother consented to the termination of her parental rights and a decree to that effect was entered on July 28, 2015.

*Retired Senior Judge assigned to the Superior Court.

given Mother. [Father denies having used E.T. as an alias, stating this is what caused him to question paternity.]

[CYS] then modified [its] search for Father. Father did not have a prior history with [CYS] but did have a criminal history, which included robbery in 1998, burglary armed or causing injury in 1998, manufacturing/delivering drugs in 2009, retail theft in 2012 and 2013, public drunkenness in 2013, and false identification to [l]aw [e]nforcement in 2013. [CYS] was unable to contact Father using the information he had provided Mother. His whereabouts remained unknown until August 15, 2014, when he was located at the Lancaster County Prison (LCP).

[A CYS] caseworker met with Father at LCP on August 22, 2014. Father reported that he met Mother in April or May of 2014 and provided his information to her. Mother provided that information to [CYS] in July 2014. Father testified that he had doubts about paternity. He stated he wanted to be involved with [S.R.], if he [was] in fact her father. However, he had done nothing to establish the validity of Mother's claim after being given notice [of S.R.'s existence]. Father did not deny the possibility that he was S.R.'s father. In fact, the caseworker testified that he appeared interested in the fact that S.R. might be his daughter. On August 29, 2014, the [CYS] caseworker again met with Father while he was in prison, informing him of a paternity test scheduled September 16, 2014.

At the ten month review hearing on September 2, 2014, Father was present for the first time. The [c]ourt reminded Father to stay in contact with [CYS] after his release from prison and to participate in [CYS's] assessments. He was cooperative and submitted to the paternity testing while incarcerated. However, after his release later in September, [CYS] was once again unable to contact Father. Father never attempted to contact [CYS] after his release.

On October 2, 2014, the paternity results established [Father] as the biological father of S.R. That same day, the caseworker went unannounced to Father's home. When no one answered, she left her card with instructions to contact [CYS]. The caseworker also sent a letter informing Father of the paternity results. Father testified he never received the card, but did agree that he received the letter confirming his paternity.

- 2 -

The caseworker again conducted an unannounced home visit on October 15, 2014, but was unable to make contact with Father. It is uncontested that [CYS] had no contact with Father during this period of time, despite his paternity being confirmed and [CYS's] attempts to contact him. Neither Mother nor Father [was] present for the eleven month review hearing held on October 22, 2014.

Father contacted [CYS] in November 2014, nearly eight months after Father had been apprised [of] S.R.'s existence. He was once again in the LCP, having violated his probation. He testified that he did not contact the caseworker during the nearly two months after he was released from prison because he was shocked and distraught that he had a daughter and that she was in placement. Father stated that he would be incarcerated for one year and was unable to care for S.R. He did provide names of possible kinship resources.

Father was given a child permanency plan [(CPP)] for reunification with the following objectives: mental health, drug and alcohol, crime free, parenting skills, financial stability, obtain housing, and commitment. [CYS] encouraged Father to participate any mental health and drug and alcohol programs available while incarcerated. The fifteen month review hearing was held on February 4, 2015. Father, who remained incarcerated, was present. Father did send letters to [CYS] for S.R., but no progress was reported on his CPP.

On March 12, 2015, [CYS] denied kinship care placement, having determined it was in S.R.'s best interest to remain in her current resource home where she had been placed since birth, and not be moved to either her paternal grandparents' home or Father's wife's home. Her resource parents were a possible adoptive resource. [On March 26, 2015, CYS filed a petition seeking to terminate involuntarily Father's parental rights to S.R. and confirm Mother's consent to adoption by S.R.'s foster parents.]

The [termination of parental rights (TPR)] hearing and 19 month review hearing were held on June 2 [and July 28,] 2015. At that time, Father was incarcerated at SCI Camp Hill and reported an anticipated release date of November 2015. Father reported he participated in the drug and alcohol program and

parenting program at LCP. Father continued to send letters to [CYS] for S.R. All of Father's [CPP] goals remained incomplete.

Orphans' Court Opinion, 11/13/2015, at 3-6 (citations and unnecessary capitalization omitted).

On November 13, 2015, the orphans' court issued its decree terminating Father's parental rights to S.R. Father timely filed a notice of appeal, along with a concise statement of errors complained of on appeal. The orphans' court filed an opinion.

Father presents this Court with a single question:

Where Father was incarcerated prior to learning that he was the parent of a dependent child; where he, while incarcerated initiated frequent contact with [CYS] and sought opportunities to be involved with his child; where he availed himself of remedial programs while in prison; and where his maximum release date is not distant, was it an abuse of discretion to grant [CYS's] petition to terminate?

Father's Brief at 5 (suggested answer omitted).

We consider Father's question mindful of the following.

In cases involving the termination of a parent's rights, our standard of review is limited to determining whether the order of the trial court is supported by competent evidence, and whether the trial court gave adequate consideration to the effect of such a decree on the welfare of the child.

Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand…. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re C.W.U., Jr.*, 33 A.3d 1, 4 (Pa. Super. 2011) (internal quotations and citations omitted).

Here, the orphans' court determined that CYF met its burdens under subsections (a)(1) and (a)(2) of 23 Pa.C.S. § 2511, as well as its subsection (b) burden. Because we agree with the orphans' court's determination that CYS met its burden under subsection (a)(2), we need not consider Father's other arguments. *In re I.E.P.*, 87 A.3d 340, 344 (Pa. Super. 2014) ("This Court must agree with only one subsection of [] 2511(a), in addition to subsection 2511(b), in order to affirm the termination of parental rights.").

The governing statute provides as follows.

**(a) General rule**.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

* * *

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

* * *

**(b) Other considerations**.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

23 Pa.C.S. § 2511.

We first address whether the orphans' court abused its discretion by terminating Father's parental rights pursuant to Section 2511(a)(2).

> In order to terminate parental rights pursuant to 23 Pa.C.S.[] § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

**In re Adoption of M.E.P.**, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted).

> [S]ubsection (a)(2) does not emphasize a parent's refusal or failure to perform parental duties, but instead emphasizes the child's present and future need for essential parental care, control or subsistence necessary for his physical or mental well-being. Therefore, the language in subsection (a)(2) should not be read to compel courts to ignore a child's need for a stable home and *strong, continuous parental ties,* which the policy of restraint in state intervention is intended to protect. This is particularly so where disruption of the family has already occurred and there is no reasonable prospect for reuniting it[.] Further, grounds for termination under subsection (a)(2) are not limited to affirmative misconduct; those grounds may include acts of incapacity to perform parental duties.

**In re E.A.P.**, 944 A.2d 79, 82 (Pa. Super. 2008) (citations and quotation marks omitted; emphasis in original).

Instantly, the orphans' court concluded that Father has demonstrated a continued inability to parent S.R., and has demonstrated that he is incapable of remedying this incapacity. Orphans' Court Opinion, 11/13/2015, at 10-13. In so holding, the court emphasized Father's present incarceration

- 6 -

and his continued involvement in criminal activity despite confirmation of S.R.'s paternity. *Id.*

Father contends that, although he has never met S.R. in person, he has communicated with his CYS caseworker to inquire about her well-being. Father's Brief at 10-11. Further, while incarcerated, Father has completed a number of programs required by CYS. *Id.* at 14. Finally, Father argues that he is "not facing a prolonged period of waiting before he could be in a position to parent" S.R. because his "maximum release date is October 2017, with an earlier release a possibility." *Id.* at 13.

Our Supreme Court has held that

incarceration, while not a litmus test for termination, can be determinative of the question of whether a parent is incapable of providing "essential parental care, control or subsistence" and the length of the remaining confinement can be considered as highly relevant to whether "the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent," sufficient to provide grounds for termination pursuant to 23 Pa.C.S. § 2511(a)(2). *See e.g. Adoption of J.J.,* 515 A.2d at 891 ("[A] parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties."); *E.A.P.,* 944 A.2d at 85 (holding termination under § 2511(a)(2) supported by mother's repeated incarcerations and failure to be present for child, which caused child to be without essential care and subsistence for most of her life and which cannot be remedied despite mother's compliance with various prison programs). If a court finds grounds for termination under subsection (a)(2), a court must determine whether termination is in the best interests of the child, considering the developmental, physical, and emotional needs and welfare of the child pursuant to § 2511(b). In this regard, trial courts must carefully review the individual circumstances for every child to determine, *inter alia,* how a

parent's incarceration will factor into an assessment of the child's best interest.

***In re Adoption of S.P.***, 47 A.3d 817, 830-31 (Pa. 2012).

After a thorough review of the record in this matter, we conclude that the orphans' court did not abuse its discretion by terminating Father's parental rights involuntarily. The court properly found that Father has never provided S.R. with essential parental care, despite having the opportunity to do so during 2014 after his release from LCP. The court noted that "it may be commendable that Father, while incarcerated, has made an effort to become involved in [S.R.'s] life via correspondence, but it is compelling that he never made any effort to be involved in her life when in the community." Orphans' Court Opinion, 11/13/2015, at 10-11. Moreover, the court noted that Father cannot presently provide S.R. with parental care and that Father's "declared resolve" to care for S.R. upon his eventual release "is doubtful, given his past parenting history while not incarcerated" and his "continued criminal activity within the past several years … despite the existence of his other children, the possibility that S.R. might be his child, and the later confirmation that S.R. was his child." ***Id.*** at 11. We agree with the court that Father's repeated and continued incapacity has caused the S.R. to be without essential parental care, control or subsistence necessary for her physical or mental well-being, and the conditions and causes of the incapacity cannot or will not be remedied. Accordingly, we find no abuse of

discretion in the orphans' court determination that CYS met its burden under subsection (a)(2).

Next, we consider whether termination was proper under Section 2511(b). The requisite analysis is as follows.

> Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In **In re C.M.S.**, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case.

**In re Adoption of J.M.**, 991 A.2d 321, 324 (Pa. Super. 2010) (some citations omitted).

Here, the orphans' court concluded that it would be in the best interests of S.R. for Father's parental rights to be terminated. The court found that S.R. is strongly bonded with her foster parents, who have cared for her since birth, provide for her daily needs and welfare, and wish to adopt her. Orphans' Court Opinion, 11/13/2015, at 14. The court determined that, because the two have never met, S.R. has no bond with Father. **Id.** Further, the court expressed concern that Father's continued incarceration and lack of parental involvement during 2014 when he was not incarcerated, demonstrate that Father's "future ability to provide for S.R.'s

welfare and needs and his ability to forge a bond with her is [*sic*] merely speculative." ***Id.***

Again, we conclude that the record supports the orphans' court's decision it would be in S.R.'s best interest if Father's parental rights were terminated. S.R. is bonded with her foster parents and is thriving in their care. In contrast, the record establishes that S.R. has no bond with Father. While Father contends that he will perform his parental duties upon his release from state prison, it is clear that, even by Father's estimation, he will not be able to care for S.R. for another year. S.R. deserves better than what Father can offer. ***See***, ***e.g.***, ***In re C.L.G.***, 956 A.2d at 1008 ("[I]f we were to permit Mother further opportunity to cultivate an environment where she can care for C.L.G., we would be subjecting a child, who has been waiting for more than two years for permanency, to a state of proverbial limbo in anticipation of a scenario that is speculative at best.").

Accordingly, because we conclude that the orphans' court did not abuse its discretion by involuntarily terminating Father's parental rights pursuant to Sections 2511(a)(2) and (b), we affirm the order of the orphans' court.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/24/2016