J-S02018-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: L.M., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: M.M., FATHER | : | No. 1860 EDA 2021 |

Appeal from the Decree Entered August 26, 2021
In the Court of Common Pleas of Montgomery County
Orphans' Court at No(s): 2021-A0001

BEFORE: OLSON, J., KING, J., and McCAFFERY, J.

MEMORANDUM BY KING, J.:         **FILED FEBRUARY 28, 2022**

Appellant, M.M. ("Father"), appeals from the decree entered in the Montgomery County Court of Common Pleas, Orphans' Court Division, granting the petition of Appellees, J.P. ("Mother") and C.P. ("Stepfather"), for involuntary termination of Father's parental rights to his minor child, L.M. ("Child"). We affirm.

The trial court opinion set forth the relevant facts of this appeal as follows:

> After [Child] was born in 2011, [Mother] and Child lived separately from [Father]; [Mother] lived with her grandmother and [Father] lived next door with his mother. [Father] made routine visits for a period of time. [Father] was incarcerated from 2012-2015 at SCI Chester. In 2012, while [Father] was incarcerated, [Mother] took [Child] to visit him two to four times. According to [Father], he saw [Child] "like every other weekend" for the first year of his incarceration. Thereafter, [Mother] did not bring [Child] to see [Father] while he was in prison through June 2015. [Father] attempted to contact [Mother] by phone, but according to [Mother], the calls became threatening and more frequent, so she issued a no-call request at the jail. [Mother] claims she continued to send photos and letters to

[Father]. However, [Father] was not able to receive anything from [Mother] through the prison because of the no-contact order. As [Mother] received no acknowledgement of the pictures she sent to [Father], she began to send them to him through paternal grandmother.

In July 2015, after [Father] was released from prison, paternal grandmother contacted [Mother] about visitation with [Father]. At that time, [Mother] lived in Eagleville, Pennsylvania with her husband whom she married in a Presbyterian Church on July 18, 2015. [Mother] met her current spouse, [Stepfather], a correctional officer at SCI Phoenix, around October 2014. [Stepfather] met [Child] around November 2014. The two developed a bond and eventually, [Stepfather] wanted to adopt her. He supplies financial support for [Child]. Their "tight bond" is demonstrated by his involvement in her life, supporting her school and extracurricular life, transporting her to ballet, swim lessons, and tap, as well as viola and archery lessons.

After [Father] was released from incarceration, [Mother] would not permit [Child] to see [Father] unless a court ordered it. On August 1, 2016, a Delaware County custody order awarded joint legal custody of [Child] to [Father] and [Mother]; primary physical custody to [Mother]; and partial physical custody to [Father] on the weekends every other week.[1] Additionally, the family court ordered the parties to keep in contact, speak regularly regarding custody, prevent the child from being pierced/tattooed without both parties' consent, provide the necessary transportation for the child, with [Father] beginning overnight visits on a trial basis. Visitations occurred with [Father] and [Child] for a period of time, however, [on] September 8, 2017, [Father] was incarcerated again. He posted bail on May 8, 2018. [Father] contacted [Mother] upon release and visits resumed. As a result of his re-incarceration, the last time [Father] saw [Child] was November 4, 2018. He served a

_____

[1] When the court entered the 2016 custody order, Mother and Father both lived in Delaware County. (*See* N.T. Hearing, 8/26/21, at 54). Mother moved from Delaware County to Montgomery County in October 2018. (*Id.* at 49). Around that time, Father moved from Delaware County to the state of Delaware. (*Id.* at 56, 87).

sentence and was released from prison in May of 2019. During his incarceration, he did not make contact with [Child]. According to [Father], he did not have the number or address of [Mother] or [Child] after he lost his phone. When he was released from prison, [Father] tried contacting [Mother] via text but she did not respond. He also claims he went to the Media Courthouse to try to file a "complaint" to amend the custody order but that he could not file anything because he did not have a current address for [Child]. [Father] made no other efforts to locate or contact [Mother] or [Child] after his release.

[Father] was incarcerated again from 2019 to 2021.

(Trial Court Opinion, filed October 11, 2021, at 2-3) (internal record citations omitted).

On January 5, 2021, Appellees filed a petition for involuntary termination of Father's parental rights and a petition for Stepfather to adopt Child. The court conducted a termination hearing on August 26, 2021. Immediately following the hearing, the court entered a final decree terminating Father's parental rights. The decree also permitted Child's adoption to proceed without further notice to Father. Father timely filed a notice of appeal on September 15, 2021. The notice of appeal included a concise statement of errors complained of on appeal.

Father now raises two issues for our review:

Did the trial court err in granting the petition for involuntary termination of parental rights of Father under 23 Pa.C.S. § 2511(a)(1)?

Did the trial court err in granting the petition for involuntary termination of parental rights of Father under 23 Pa.C.S. § 2511(a)(2)?

(Father's Brief at 7).

Appellate review in termination of parental rights cases implicates the following principles:

> A parent's right to make decisions concerning the care, custody, and control of his or her children is among the oldest of fundamental rights. The time-tested law of the Commonwealth requires that we balance this intrinsic parental interest within the context of a child's essential needs for a parent's care, protection, and support. We readily comprehend the significant gravity of a termination of parental rights, which has far-reaching and intentionally irreversible consequences for the parents and the child. For these reasons, the burden of proof is upon the party seeking termination to establish by clear and convincing evidence the existence of the statutory grounds for doing so. [C]lear and convincing evidence is defined as testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue. Because of this serious impact attending the termination of parental rights, it is important that a judicial decree extinguishing such rights be based solely on competent evidence.
>
> In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. This standard of review corresponds to the standard employed in dependency cases, and requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but it does not require the appellate court to accept the [trial] court's inferences or conclusions of law. That is, if the factual findings are supported, we must determine whether the trial court made an error of law or abused its discretion. An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion; we reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill will. Thus, absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's

- 4 -

decision, the decree must stand. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. However, [w]e must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re Adoption of C.M.*, ___ Pa. ___, ___, 255 A.3d 343, 358-59 (2021)

(internal citations and quotation marks omitted).

Appellees filed a petition for the involuntary termination of Father's parental rights on the following grounds:

**§ 2511.  Grounds for involuntary termination**

**(a)   General rule.—**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1)    The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

\* \* \*

**(b)   Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (b).   "Parental rights may be involuntarily

terminated where any one subsection of Section 2511(a) is satisfied, along with consideration of the subsection 2511(b) provisions." *In re Z.P.*, 994 A.2d 1108, 1117 (Pa.Super. 2010).[2]

On appeal, Father contends that he "has made every effort to maintain a place of importance in his Child's life." (Father's Brief at 15). Father emphasizes his testimony from the termination hearing indicating: 1) he provided Mother with a one-time payment of $1,500.00 for Child's care; 2) he taught Child how to fish, ride a bike, and throw a football; and 3) he has several other children with whom Child should develop relationships. Father maintains that he "has fought extensively to maintain his visitation [rights] throughout the case," even utilizing his own family members "to assist him in continuing visitation while he was incarcerated." (*Id.* at 16).

Father complains that the court should have considered his explanation for his apparent neglect of Child, which Father blames on barriers created by Mother. Father asserts that Mother refused to bring Child for visits while he was incarcerated, and Mother demanded a court order for all visitation following Father's release. Father also argues that Mother has "moved and changed her [phone] number in a manner that made it exceedingly difficult for Father to maintain contact with" Child. (*Id.* at 17). Father insists that his

_____

[2] Appellees also sought the involuntary termination of Father's parental rights under Section 2511(a)(2), but we need only analyze Section 2511(a)(1) for purposes of this appeal.

"conduct shows that he has made every effort to provide for his daughter in the only ways he can." (*Id.*) Father concludes that the trial court erred in terminating his parental rights pursuant to Section 2511(a)(1). We disagree.

"A court may terminate parental rights under subsection 2511(a)(1) when the parent demonstrates a settled purpose to relinquish parental claim to a child or fails to perform parental duties for at least six months prior to the filing of the termination petition." *In re I.J.*, 972 A.2d 5, 10 (Pa.Super. 2009).

> Though we do not adhere to any strict definition of parental duty, a child has a right to essential parental care, and our jurisprudence reveals certain irreducible qualities of a parent's attendant obligation. Foremost, it is a positive duty requiring affirmative performance. [C]ommunication and association are essential to the performance of parental duty[.] [P]arental duty requires that a parent exert himself to take and maintain a place of importance in the child's life. A parent must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship, or his rights may be forfeited. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

*Adoption of C.M., supra* at ___, 255 A.3d at 364 (internal citations and quotation marks omitted).

Regarding the six-month period prior to filing the termination petition:

> [T]he trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his or her parental rights, to determine if the evidence, in light of the

> totality of the circumstances, clearly warrants the involuntary termination.

***In re B., N.M.***, 856 A.2d 847, 855 (Pa.Super. 2004), *appeal denied*, 582 Pa. 718, 872 A.2d 1200 (2005) (internal citations omitted).

"Each case of an incarcerated parent facing termination must be analyzed on its own facts, keeping in mind … that the child's need for consistent parental care and stability cannot be put aside or put on hold[.]" ***Interest of K.M.W.***, 238 A.3d 465, 474 (Pa.Super. 2020) (*en banc*) (quoting ***In re E.A.P.***, 944 A.2d 79, 82-83 (Pa.Super. 2008)). "The focus is on whether the parent utilized resources available while in prison to maintain a relationship with his or her child. An incarcerated parent is expected to utilize all available resources to foster a continuing close relationship with his or her children." ***In re B., N.M., supra*** at 855 (internal citations omitted). "Importantly, a parent's 'recent efforts to straighten out [his] life' upon release from incarceration does not require that a court 'indefinitely postpone adoption.'" ***Interest of K.M.W., supra*** at 474 (quoting ***In re Z.P., supra*** at 1125).

> Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

***In re Z.S.W.***, 946 A.2d 726, 730 (Pa.Super. 2008) (internal citations omitted).

Under Section 2511(b), the court must consider whether termination will meet the child's needs and welfare. *In re C.P.*, 901 A.2d 516, 520 (Pa.Super. 2006). "Intangibles such as love, comfort, security, and stability are involved when inquiring about the needs and welfare of the child. The court must also discern the nature and status of the parent-child bond, paying close attention to the effect on the child of permanently severing the bond." *Id.* (internal citations omitted). "In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship." *In re Z.P., supra* at 1121.

Instantly, Mother and Father both testified that Father has not seen Child since November 4, 2018. (*See* N.T. Hearing at 40, 89). Thus, Father failed to perform parental duties for at least six months prior to the filing of the January 2021 termination petition. *See In re I.J., supra*. Regarding Father's attempts to foster a continuing, close relationship with Child, Mother testified that Father made no effort to contact Child after November 2018. (*See* N.T. Hearing at 40). Mother stated that Father did not attend Child's school activities or provide birthday/holiday gifts or cards. (*Id.* at 58, 61). Mother admitted, however, that Father provided financial support in the form of a one-time payment of $1,500.00 after Father obtained funds from an accident settlement. (*Id.* at 62).

Father's testimony focused on providing explanations for his extended

absences from Child's life. Specifically, Father conceded that he was incarcerated from 2012 to 2015 and 2019 to 2021. (*Id.* at 80, 94). During the first period of incarceration, Father relied on Mother and Paternal Grandmother to bring Child to the prison for visits. (*Id.* at 80-82). Upon his release in 2015, Mother insisted that Father obtain a custody order before she would make Child available for visitation. (*Id.* at 84). Thereafter, Father obtained partial custody under the Delaware County order, and he stayed in continuous contact with Child until his next prison term. (*Id.* at 86).

Father blamed Mother and Stepfather for keeping him "out [of] the loop" about all aspects of Child's life, including school and extracurricular activities. (*Id.*) Although Father conceded that he was aware of Mother's move to Montgomery County, Father claimed that he did not memorize her address.[3] Instead, Father kept the address stored in his phone, and he lost the phone while incarcerated. (*Id.* at 89). Father maintained that the loss of the phone, and the corresponding loss of Mother's new address, left him unable to contact Child after 2018. (*Id.* at 89-90). Complicating matters further, Mother changed her phone number at some point in 2019. (*Id.* at 51). Father did not have Mother's new phone number, and the text messages he sent to Mother's old phone number went unanswered. (*Id.* at 92).

---

[3] Father testified that he drove to Mother's new residence in 2018 for the final custody exchange before his incarceration. (*See* N.T. Hearing at 88-89). Nevertheless, Father was "not familiar with that area," and he "put the address on [his] GPS … and it took [him] there." (*Id.* at 89).

Father claimed that he went to the Delaware County Court of Common Pleas to enforce his custody rights in 2019, but "they wouldn't allow [Father] to follow through with the complaint" because Father did not know Mother's new address. (*Id.* at 93). Father also claimed to have hired a private investigator to find Mother's address, but the investigator was unsuccessful. (*Id.*) Father made no additional attempts to find Child, deciding to wait until the termination hearing to obtain information about her whereabouts. (*Id.*)

Significantly, the court did not find Father credible:

> [Father] claims that he did not contact [Child] because he did not have her phone number or address and he was imprisoned. However, the [c]ourt found Father's explanation unpersuasive and not credible. In light of the totality of the circumstances, Father's absence from [Child's] life was far more prevalent than his effort to connect with her.
>
> * * *
>
> Father could have had access to a computer while in prison and could have undertaken greater efforts to locate the number or address for [Child]. He could have asked prison guards to retrieve the telephone number from his cellphone. The law imposes a duty on him to use all available resources to foster a continuing relationship with his child—and he did not do so.
>
> This [c]ourt considered Father's explanation and found his efforts to be insufficient. Although [Mother] had imposed obstacles by failing to respond to Father's texts or failing to inform the Delaware County court about her address change, the [c]ourt found that the duty imposed upon Father—to affirmatively maintain a relationship with his child—was not met by his actions.

(Trial Court Opinion at 7-8) (internal citations omitted).

- 11 -

Here, the court properly examined Father's individual circumstances, and it considered his explanations before determining that involuntary termination was warranted. *See In re B., N.M., supra*. Likewise, competent evidence supported the court's credibility determinations. *See Adoption of C.M., supra*. Although Father expressly testified that he loves Child and takes care of his children, our review of the record reveals that Father allowed his relationship with Child to lapse due to a lost cellphone and some unanswered text messages. Such relatively minor setbacks did not justify Father's failure to perform **any** parental duties since 2018. *See Interest of K.M.W., supra*.

Regarding Section 2511(b), the court recognized that termination of Father's parental rights would best serve Child's needs and welfare.

> [Mother] met [Stepfather], who is a correctional officer at SCI Phoenix in or around October 2014. He met [Child] around November 2014. He had a bond with her and wanted to adopt her. He supplies financial support for [Child]. [Child] and [Stepfather] have a close relationship—a "tight bond"—he picks her up and takes her to ballet, swim lessons, and tap, as well as viola and archery lessons. [Child's] best interests would be served by adoption by her stepfather.

(Trial Court Opinion at 11). Again, the record supports the court's conclusion that Stepfather provides the love, comfort, security, and stability that Child needs. *See In re C.P., supra*. Consequently, we affirm the decree terminating Father's parental rights to Child.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/28/2022