J-A06022-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: E.L.T.B-G. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: V.S. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 906 WDA 2022 |

Appeal from the Order Entered July 11, 2022
In the Court of Common Pleas of Allegheny County Civil Division at
No(s): CP-02-AP-0000191-2020

BEFORE:   OLSON, J., NICHOLS, J., and PELLEGRINI, J.[*]

MEMORANDUM BY NICHOLS, J.:                    **FILED: APRIL 13, 2023**

V.S. (Father) appeals from the order granting the petition filed by the Allegheny County Office of Children, Youth, and Families (CYF) to involuntarily terminate Father's parental rights to E.L.T.B-G. (Child).  After careful review, we vacate the trial court's order and remand for further proceedings consistent with this memorandum.

The trial court summarized the underlying facts and procedural history of this matter as follows:

> [Child] was born July 4, 2018, to [C.R.] (Mother) and [Father]. [Mother]  passed  away  on  October  27,  2021.    [Father]  has remained incarcerated throughout the duration of the case.  [Child and his older sibling] were brought into care while infants, still in the hospital, having never lived with either biological parent.

> [Child]  was  removed  from  Mother's  care  on  July  9,  2018  and adjudicated dependent on March 6, 2019.  At the time of removal

_____

[*] Retired Senior Judge assigned to the Superior Court.

and adjudication, [Father] was not known to be [Child's father]. However, as of November 8th of 2021, paternity was established through genetic testing. CYF first made contact with [Father] in September of 2020, and he had participated in a prior hearing while incarcerated.

[CYF] filed petitions for involuntary termination of parental rights for both Mother and [Father, who was not yet confirmed to be Child's biological father] on December 1, 2020. The [termination of parental rights (TPR)] petition was amended to add [Father as Child's father] on April 16, 2021. CYF sought termination of Father's parental rights due to his lack of substantial progress or involvement under Section 2511(a)(1), 2511(a)(2), 2511(a)(5), 2511(a)(8) and Section 2511(b) [] of the Adoption Act.

\* \* \*

At the March 18, 2022 hearing on CYF's petition for involuntary termination, Father's counsel presented a motion to continue to the matter on Father's behalf. That motion was denied.

It was established that Father had notice of the hearing. Father was currently incarcerated and [Jeffrey Eisenberg, Esq. (Father's counsel)], had unsuccessfully been able to reach Father or [Father's c]ounselor for the scheduled TPR Hearing. Father's counsel placed on the record his efforts to reach Father, through his counselor at FCI Cumberland. According to [Father's counsel], he had spoken with his client the day prior to the TPR Hearing, and it was Father's "understanding that his counselor was to be in today to assist in this matter." [Father's counsel] also stated for the record, his efforts to email and call Father's counselor at the prison, and check his own voicemails and emails for any indication of their efforts to reach him. The court again denied [Father's counsel's] motion for a continuance due to this matter being on the docket for a TPR hearing for over two years.

Trial Ct. Op., 10/28/22, at 2-3; 5-6 (some formatting altered).

At the termination hearing, CYF presented testimony from caseworker Krista Boyer, who stated that Father is currently incarcerated at FCI Cumberland and is scheduled to be released in 2025. N.T. Termination Hr'g,

3/18/22, at 13. Ms. Boyer explained that after Father was informed that he might be Child's biological parent in September of 2020, Father agreed to take a paternity test. *Id.* at 19, 24. Ms. Boyer stated that when the engagement specialist met with Father in September of 2020, Father "didn't want to complete a full assessment, [and] was just interested in getting the genetic test to determine if he was [Child's] father." *Id.* at 14-15. When asked if CYF typically establishes goals or provides services for individuals who are "not certain if they are the father," Ms. Boyer explained: "If they acknowledge that they could be the father and believe that they may be, and they engage in the assessments and everything, then, yes, we do establish goals for them. And one of those goals can also be determining paternity with a genetic test." *Id.* at 34. Because a full assessment was never completed, Ms. Boyer stated that Father's "blanket" goals were to address his criminal charges, contact CYF, and have contact Child. *Id.* at 25.

Ms. Boyer confirmed that the dependency court issued an order for Father to complete a DNA test in February of 2021, but the testing was initially delayed due to COVID-19 protocols for incarcerated individuals. Father was subsequently transferred from Allegheny County Jail to FCI Cumberland on April 5, 2021. However, Ms. Boyer stated that CYF was not informed about the transfer, which further delayed Father's DNA test and resulted in Father's address being listed as "unknown" on the April 21, 2021 amended TPR petition. Ultimately, Ms. Boyer testified that Father's paternity was confirmed through a DNA test that was completed on November 8, 2021. *Id.* at 21.

However, Ms. Boyer stated that she was unsure when CYF received the report or when Father was notified about the results. *Id.*

Ms. Boyer confirmed Father had appeared virtually for the "show-up" TPR hearing November 17, 2021. *Id.* at 15, 38. Ms. Boyer stated that Father had "not made any attempts to make any kind of contact with [CYF] or [Child]." *Id.* at 37. Ms. Boyer testified that she never had any contact with Father and that, although she attempted to contact Father by phone at FCI Cumberland on one occasion, "no one answered." *Id.* at 25.

With respect to visitation, Ms. Boyer stated that although Father had never requested visitation with Child, she was unsure whether CYF's "engagement specialist ever made clear to [Father] that he could have [visits]." *Id.* at 12-13, 25. Additionally, Ms. Boyer confirmed that neither she nor the engagement specialist every provided Father with any information about Child's home address. *Id.* at 35.

Ms. Boyer explained that Father contacted CYF in February of 2022 and requested that CYF consider his mother (Child's paternal grandmother) as a potential placement until Father was released from prison. *Id.* at 15. However, Ms. Boyer stated that after Child's paternal grandmother learned that Child had been in placement for four years, she stated that "she would like to have a relationship [with Child] but wasn't necessarily sure that she wanted to disrupt where [Child] was." *Id.* at 16.

Ultimately, the trial court concluded that CYF had presented clear and convincing evidence to support the termination of Father's parental rights

under Sections 2511(a)(1), (2), (5), (8), and (b), due to Father's lack of substantial progress or involvement with Child. *Id.* at 63.

Following the termination hearing, Father's counsel filed a motion to reopen the case to allow Father to testify on his own behalf. The trial court granted the motion and conducted an additional hearing on April 29, 2022. At that time, Father confirmed that he had agreed to DNA testing in 2021. When asked if he had hoped for a certain result, Father stated: "I was hoping to be the father so I could step up. I don't have no kids now. That would be my first child." N.T. Hr'g, 4/29/22, at 10. Father indicated that he first applied for an attorney after he received a packet with information about the parent advocate program in December of 2021. *Id.* at 11. Father stated that he did not receive any further communication from CYF until he received a packet stating that he was Child's biological father in early 2022. *Id.* at 10-11. Father testified that CYF never contacted him about visitation or sent him any information about or photographs of Child. *Id.* at 13-14. Additionally, Father stated that although he reached out to his CYF caseworker four times, the caseworker declined to take his phone calls because they were coming from a federal correctional facility. *Id.* at 13.

Ultimately, on July 11, 2022, the trial court issued an order terminating Father's parental rights under Sections 2511(a)(1), (2), (5), (8), and (b).

Father timely complied with Pa.R.A.P. 1925(a)(2)(i) and the trial court issued a Rule 1925(a) opinion addressing Father's claims.

On appeal, Father raises the following issues:

- 5 -

1. Did the trial court abuse its discretion and/or err as a matter of law in granting the petition to involuntarily terminate Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), and (8)?

2. Did the trial court abuse its discretion and/or err as a matter of law in concluding that CYF met its burden of proving by clear and convincing evidence that termination of Father's parental rights would best serve the needs and welfare of the child pursuant to 23 Pa.C.S. § 2511(b)?

Father's Brief at 6.

Initially, we must review whether the trial court appointed legal counsel to represent Child for the termination proceedings pursuant to 23 Pa.C.S. § 2313(a). *See In re Adoption of K.M.G.*, 240 A.3d 1218, 1235 (Pa. 2020). Our Supreme Court has interpreted Section 2313(a) "as requiring 'that the common pleas court appoint an attorney to represent the child's legal interest, *i.e.* the child's preferred outcome.'" *Id.* (citation omitted). Additionally, the failure to appoint a "'separate attorney to represent the child's legal interests constitutes structural error, meaning it is not subject to a harmless-error analysis.'" *Id.* (citations omitted).

It is well settled that "a single attorney cannot represent a child's best interests and legal interests if those interests conflict." *Id.* at 1236 (citation omitted). As such, our Supreme Court has held that **before** appointing an individual to serve as both guardian *ad litem* (GAL) and legal counsel for a child, the trial court "must determine whether counsel can represent the dual interests . . ." *Id.* Further, where the trial court appoints one attorney "to represent both the child's best interests and legal interests, appellate courts

- 6 -

should review *sua sponte* whether the [trial] court made a determination that those interests did not conflict." *Id.* at 1235.

Here, the record reflects that the trial court appointed Eli Zlokas, Esq. "to represent the **legal interests** of Child in connection with any proceedings related to termination of parental rights[.]" *See* Trial Ct. Order, 3/11/22. However, although Attorney Zlokas was appointed as Child's legal counsel, it appears that Attorney Zlokas served in a dual capacity as Child's legal counsel and as GAL during the termination proceedings.

Indeed, the record reflects that Attorney Zlokas stated a position with respect to Child's best interests and Child's legal interests. Specifically, Attorney Zlokas argued that CYF had met its burden by clear and convincing evidence and that termination was appropriate given that Child had been in foster care for "four years with a loving family." *See* N.T. Hr'g at 41-42. Attorney Zlokas also stated that a kinship arrangement was unlikely and that Child's paternal grandmother had expressed that "she wants what is best for [C]hild." *Id.* at 41. When asked if Child knew that Father existed or had a preference with respect to termination, Attorney Zlokas stated: "I observed [C]hild with his foster family and I believe that that's what [Child] wants. I'm not going to go into any great detail." *Id.* at 47.

Following our review of the record, there is no indication that the trial court made any determination as to whether there was a conflict between

Child's legal interests and best interests.[1]  *See K.M.G.*, 240 A.3d at 1236.  For these reasons, we are constrained to vacate the involuntary termination decree and remand for further proceedings.[2]  *See K.M.G.*, 240 A.3d at 1236; *see also Interest of A.J.R.O.*, 270 A.3d 563, 570-71 (Pa. Super. 2022) (reiterating that "appellate review of this question does not involve second–guessing whether GAL/[legal c]ounsel in fact had a conflict but solely whether the [trial] court made the determination in the first instance" (citation omitted)).

On remand, we direct the trial court within thirty days to fulfill its Section 2313(a) duty as articulated in *K.M.G.* and determine whether Attorney Zlokas may represent both the best interests and legal interests of Child.  If the trial court determines that no conflict exists between Child's dual interests, then

---

[1] Likewise, the trial court did not determine, nor did counsel indicate on the record, whether Child was too young to articulate a preference as to the outcome of the proceedings, such that no conflict could exist.  *See In re T.S.*, 192 A.3d 1080 (Pa. 2018).

[2] We note that in its brief, CYF contends that because Child "had never met Father and was not aware he was his biological father," Child could not express a preferred outcome with respect to the termination proceedings.  *See* CYF's Brief at 43; *see also In re Adoption of C.J.A.*, 204 A.3d 496 (Pa. Super. 2019) (concluding that, although the trial court did not appoint legal counsel for the child, remand was unnecessary because the GAL "complied with the minimum requirements of Section 2313(a)," as the child "did not and could not possess a preferred outcome" because he "did not even realize that [his biological f]ather existed").

However, as noted previously, Attorney Zlokas refused to provide an answer concerning whether Child was aware that Father existed.  Therefore, unlike the Court in *C.J.A.*, we are unable to conclude that Attorney Zlokas sufficiently represented Child's legal interests.

the court shall re-enter the termination order as to Father. If the trial court determines that there is a conflict between Child's best interests and legal interests, then the court shall appoint separate legal counsel for Child and conduct a new termination hearing at which time Child's legal counsel can advocate on behalf of Child's legal interests. *See K.M.G.*, 240 A.3d at 1235.

Order vacated.[3] Case remanded with instructions. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/13/2023

---

[3] In light of our disposition, we do not address Father's underlying claims concerning the trial court's July 2022 order terminating his parental rights to Child. Briefly, we note that Father, who is incarcerated, agreed to take a DNA test in September of 2020, and CYF subsequently received the results confirming Father's paternity in November of 2021. However, CYF did not establish any goals for Father to establish reunification with Child after receiving the paternity test results. On this record, we reiterate that incarceration, alone, is not sufficient to support termination under any subsection of 23 Pa.C.S. § 2511(a). *See In re Adoption of C.L.G.*, 956 A.2d 999, 1006 (Pa. Super. 2008). Indeed, "[i]mprisonment is but one factor the trial court must consider in analyzing a parent's performance." *In re E.A.P.*, 944 A.2d 79, 83 (Pa. Super. 2008). "While incarcerated, a parent is expected to utilize whatever resources are available to him while in prison in order to foster a continuing close relationship with his children. Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities." *Id.* (internal citation and quotation marks omitted).