J-S22003-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: B.K., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: SOMERSET COUNTY | : | |
| CHILDREN AND YOUTH SERVICES | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 137 WDA 2024 |

Appeal from the Order Entered December 20, 2023
In the Court of Common Pleas of Somerset County
Orphans' Court at No(s):  9 Adoption 2023

BEFORE:  PANELLA, P.J.E., LANE, J., and BENDER, P.J.E.

MEMORANDUM BY PANELLA, P.J.E.:                **FILED: July 26, 2024**

Somerset County Children and Youth Services ("CYS") appeals from the order entered in the Court of Common Pleas of Somerset County ("orphans' court") that denied CYS's petition to involuntarily terminate the parental rights of G.K. ("Father") to B.K. (d.o.b. 7/2016) ("Child"). After our careful review, we affirm on the basis of the orphans' court's opinion.

The orphans' court aptly sets forth the factual and procedural background in its March 14, 2024 opinion:

> [Child] was placed in the legal and physical custody of [CYS] on August 13, 2020 and was adjudicated dependent on September 1, 2020. [Child] was originally placed locally with his maternal grandfather and step-grandmother. A goal change to adoption was made on May 17, 2022. T.T. 12/20/23 at 49. [Child] was then placed with his maternal uncle and aunt in Tennessee on June 7, 2022. The maternal uncle and aunt are a willing permanency option.

The reason for the placement was a drug raid occurring at the parents' residence on August 13, 2020 that resulted in criminal charges for both parents. *Id.* at 17. Father originally spent approximately 30 days in jail incident to his arrest before being released pending trial. *Id.* at 153. Father was then out on bond until he was sentenced on September 2, 2021 and was variously housed at SCI-Smithfield, SCI-Camp Hill, SCI-Somerset and SCI-Forest. *Id.* at 24. Father was released from state incarceration on June 3, 2023. *Id.* at 149.

CYS filed a petition for termination of parental rights (TPR petition) on January 19, 2023. The trial, originally scheduled for September 22, 2023, was continued twice and ultimately held on December 20, 2023. [Child]'s mother failed to appear for the hearing and her parental rights were terminated by [the orphans'] court. No appeal was filed by the mother.

With respect to Father, however, [the orphans'] court found that the agency had not met its burden by clear and convincing evidence the grounds for termination of Father's parental rights.

Orphans' Court Opinion, 3/14/24, at 1-2 (footnote omitted).

On appeal, CYS presents the following issues for this Court's review:

I.      Sufficient competent evidence was presented for the trial court to conclude that [the] termination of [Father]'s parental rights was proper pursuant to 23 Pa.C.S.A. Section 2511(a)(1), 511(a)(2), 2511(a)(5), and 2511(a)(8).

II.     The trial court incorrectly concluded by erring as a matter of law, that denying the termination of natural Father's parental rights services the needs and welfare of [Child], pursuant to 23 Pa.C.S.A. section 2511(b).

Appellant's Brief, at 5.

Our standard of review of this matter is well-settled:

Our standard of review in termination of parental cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law

or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*Interest of A.R.*, 311 A.3d 1105, 1110 n.3 (Pa. Super. 2023) (citation omitted).

After reviewing the record, the briefs of the parties, and the Honorable Scott P. Bittner's well-reasoned Pa.R.A.P. 1925(a) Opinion, we conclude CYS's issues merit no relief. *See* Orphans' Court Opinion, 3/14/23, at 4 (concluding that "Father is a formerly incarcerated person who made efforts toward his child and case plan before, during and after incarceration leading up to the TPR hearing."), 13-16 (concluding CYS failed to provide clear and convincing evidence that: (1) Father has evidenced an intent to relinquish his parental rights or refused to perform his parental duties pursuant to 23 Pa.C.S.A. § 2511(a)(1); (2) Father has failed to remedy the cause of the incapacity, abuse, neglect or refusal, pursuant to 23 Pa.C.S.A. § 2511(a)(2); (3) "the conditions which led to the removal or placement of [Child] continue to exist," and Father "cannot or will not remedy the conditions within a reasonable period of time," pursuant to 23 Pa.C.S.A. § 2511(a)(5), (8); and (4) Father failed to "initiate[] all essential activities in his case plan" until after the TPR petition was filed).

We recognize Child has a bond with his foster parents, with whom he lives in Tennessee. However, we emphasize the court's observation that

> this decision does not mean that [Child] will be immediately ripped from the care of his foster parents. It means only that Father has retained his parental rights for the time being and he continues to have the right and opportunity to strengthen the bond and gradually spend more time with [Child]. [Child] remains a dependent child who is in the legal and physical custody of CYS, and other permanency arrangements may be available. Moreover, if the agency wishes to require a mental health evaluation or drug and alcohol evaluation that is not a self-report, it may condition additional visitation on Father undertaking such evaluations.

*Id.* at 16.

Accordingly, we affirm on the basis of the orphans' court's opinion.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 07/26/2024

- 4 -

Received 4/19/2024 12:40:20 PM Superior Court Western District

Filed 4/18/2024 12:40:00 PM Superior Court Western District
137 WDA 2024

# THE SUPERIOR COURT OF PENNSYLVANIA
## SITTING AT PITTSBURGH

### DOCKET NO. 137 WDA 2024
### Fast Track Appeal

### IN RE: B.K., a minor, Appeal of: Somerset County Children and Youth Services

### ADDENDUM/APPENDIX C - BRIEF FOR APPELLANT

**Appeal from the Order Denying the Involuntarily Termination of the Parental Rights of G.K. Appellee, entered by The Honorable Scott P. Bittner on December 20, 2023, docketed, December 21, 2023, at Docket Number 9 Adoption 2023, in The Court of Common Pleas of Somerset County, Pennsylvania, Orphans' Court Division**

Melissa A. Bergman, Esquire
Somerset County Children and Youth Services
300 North Center Avenue, Suite 220
Somerset, PA 15501
Telephone: (814) 445-1723
Facsimile: (814) 445-1725
E-Mail: bergmanm@co.somerset.pa.us
PA. I.D. # 309293
Attorney for Appellant

# ADDENDUM/APPENDIX C

# STATEMENT PURSUANT TO

# Pa.R.A.P. 1925(a)

IN THE COURT OF COMMON PLEAS OF SOMERSET COUNTY, PENNSYLVANIA

IN RE: B.K., a minor )
)
)            No. 9 Adoption 2023
Appeal of Somerset County Children and )
Youth Services. )

## STATEMENT PURSUANT TO Pa.R.A.P. 1925(a)

This Statement is issued pursuant to Pennsylvania Rule of Appellate Procedure 1925(a).

## I.      FACTUAL AND PROCEDURAL HISTORY

B.K. (the child) was placed in the legal and physical custody of Somerset County Children and Youth Services (CYS) on August 13, 2020 and was adjudicated dependent on September 1, 2020. The child was originally placed locally with his maternal grandfather and step-grandmother. A goal change to adoption was made on May 17, 2022. T.T. 12/20/23 at 49. The child was then placed with his maternal uncle and aunt in Tennessee on June 7, 2022. The maternal uncle and aunt are a willing permanency option.

The reason for the placement was a drug raid occurring at the parents' residence on August 13, 2020 that resulted in criminal charges for both parents. *Id.* at 17. Father originally spent approximately 30 days in jail incident to his arrest before being released pending trial. *Id.* at 153. Father was then out on bond until he was sentenced on September 2, 2021 and was variously housed at SCI-Smithfield, SCI-Camp Hill, SCI-Somerset and SCI-Forest. *Id.* at 24. Father was released from state incarceration on June 3, 2023. *Id.* at 149.[1]

---

[1] Pennsylvania Inmate Locator, https://inmatelocator.cor.pa.gov/#/ParoleeSearchResults (last accessed March 8, 2023). Our appellate courts have frequently taken judicial notice of the Inmate Locator. *See, e.g., Harris v. Pennsylvania State Police*, 240 A.3d 671 (Table), 2020 WL 5552591 (Pa. Cmwlth. September 17, 2020); *Hayes v. Pennsylvania Department of Corrections*, 2018 WL 1463511 (Pa. Cmwlth. March 26, 2018); *McGrath v.*

1

CYS filed a petition for termination of parental rights (TPR petition) on January 19, 2023. The trial, originally scheduled for September 22, 2023, was continued twice and ultimately held on December 20, 2023. The child's mother failed to appear for the hearing and her parental rights were terminated by this court. No appeal was filed by the mother.

With respect to Father, however, this court found that the agency had not met its burden by clear and convincing evidence the grounds for termination of Father's parental rights. The four grounds for termination alleged in the TPR petition were:

23 Pa.C.S. 2511(a)(1) - The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

23 Pa.C.S. 2511(a)(2) - The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S. 2511(a)(5) - The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

23 Pa.C.S. 2511(a)(8) - The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

The TPR petition listed nine goals that Father was required to achieve:

1) Participate and successfully complete parenting instruction, comply with all recommendations, and demonstrate all skills learned.
2) Visit with the child as scheduled.
3) Obtain and maintain stable housing.
4) Attend all medical appointments.
5) Refrain from criminal activity.

*Pennsylvania Board of Probation and Parole*, 2019 WL 5078259 (Pa. Cmwlth. October 10, 2019)(majority opinion).

2

6) Schedule and attend a mental health assessment and follow through with all recommendations.
7) Obtain and maintain stable employment and complete a budget proving he can financially support the child.
8) Obtain a drug and alcohol evaluation and follow through with all recommendations and remain drug free and submit to random drug screens.
9) Cooperate fully with CYS and sign and required releases.

TPR Petition at ¶10; TT. 12/20/23 at 19.

## II.    STANDARD OF REVIEW

In termination of parental rights cases, the trial court is in the best position to determine credibility, evaluate the evidence, and make a proper ruling. The trial court's findings in a termination proceeding which are supported by evidence of record are entitled to the same weight given a jury verdict and must be sustained unless the court abused its discretion or committed an error of law. *In re: RIS*, 36 A.3d 567, 572 (Pa. 2011)(citations omitted). The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence. *In re: B.Z.J.*, 207 A.3d 914, 921 (Pa. Super. 2019). An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. *In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012).

## III.    DISCUSSION

The party seeking the termination of parental rights bears the burden of proving that grounds for termination exist by *clear and convincing evidence*. Clear and convincing evidence is defined as testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue. *In re: RIS, supra,* at 572.

A parent's absence or failure to support his child due to incarceration is not, in itself,

3

conclusively determinative of the issue of parental abandonment. Indeed, incarceration alone is not an explicit basis for involuntary termination pursuant to Section 2511 of the Pennsylvania Adoption Code. Rather, the inquiry is whether the parent has utilized those resources at his command while in prison to continue and pursue a close relationship with the child. An incarcerated parent desiring to retain parental rights must exert himself to take and maintain a place of importance in the child's life. *Id.* at 572-73; *In re: B., N.M.,* 856 A.2d 847, 855 (Pa. Super. 2004).

On the other hand, where a parent remains incarcerated at the time of the TPR hearing, has never provided care, has a speculative release date, and whose ability to provide a home for the child upon release is similarly speculative, a trial court should grant termination of such parent's rights. *See, e.g., In re: J.W.,* 2013 WL 11256804 (Pa. Super. July 11, 2013); *In re: Adoption of Z.V.H.,* 2020 WL 1922542 (Pa. Super. April 21, 2020)(holding that where father expected to serve another four to eight years' incarceration following filing of petition, father not meeting child's needs).

This court is mindful of the Superior Court's holding in *In Re: E.A.P.* 944 A.2d 79, (Pa. Super. 2008) wherein the court stated:

> Each case of an incarcerated parent facing termination must be analyzed on its own facts, keeping in mind, with respect to subsection (a)(2), that the child's need for consistent parental care and stability cannot be put aside or put on hold simply because the parent is doing what she is supposed to do in prison. We acknowledge Mother's argument that she is doing everything that she is supposed to be doing. Under different facts, this might be determinative or given greater weight.

*Id.* at 84.

In this case, Father is a formerly incarcerated person who, as discussed below, made efforts toward his child and case plan before, during and after incarceration leading up to the TPR hearing. With the need for a fact-specific determination in mind, the court reviews the

4

testimony and exhibits as they relate to Father's case plan goals.

## Parenting Classes

While incarcerated, Father participated in a parenting program called Inside Out both at the SCI-Somerset and SCI-Forest. Father was initially enrolled in the program at SCI Somerset, and then re-enrolled at SCI-Forest after transfer. Father testified he was enrolled at SCI Somerset prior to 2023, but he can verify he was mid-course at SCI-Forest as of March 2023 via a note from the instructor. Due to being released, he was unable to complete the program. T.T. 12/20/2023 at 60, 159,185; Father's Exhibit 6B (admitted without objection).

Following his release on June 3, 2023, Father completed a five-hour parenting class on July 29, 2023 called HUGS. This program is approved by Cambria County but not by Somerset County. *Id.* at 173, Father's Exhibit 5. At trial, the Guardian ad Litem objected to admission of the HUGS certificate on the grounds that the class is geared toward custody cases rather than dependency cases. This court admitted the exhibit for the purpose of buttressing Father's testimony that he took and passed a class on this subject. *Id.* at 175-76. After Father completed the course, the CYS caseworker informed Father she would not accept that course as compliance. *Id.* at 60, 153, 212.

Father then completed as of September 14, 2023 an online parenting class called Parenting Wisely that is considered acceptable to the agency. *Id.* at 29, 94, 170-71; Father's Exhibit 4 (admitted without objection).

At trial, the CYS caseworker deferred to their expert, Carol Patterson, as to whether Father demonstrated what he learned in the class. *Id.* at 33. The CYS caseworker appeared overly troubled about an incident during Father's August 25, 2023 bonding study when the child sat on a toy meant for a two-year old and was not corrected. *Id.* at 94. In contrast, Carol Patterson, who conducted the study, did not remember which parent was involved in this incident and did not bother to include it in her report. *Id.* at 138-39. Patterson's study is discussed in further detail below, but

5

for now the court notes that Patterson found no large parenting deficits on the part of Father in her written report or her testimony. *Id.* at 113-14, CYS Exhibit O.

To that extent, there is adequate evidence of record to support a finding that Father demonstrated what he had learned in parenting class. There is also evidence of record to support a finding that Father initiated and participated in parenting classes while incarcerated prior to the filing of the TPR petition.

### Visitation

CYS Exhibit J is a packet of visitation records prior to the time that Father was incarcerated. These records range from September 17, 2020 to July 12, 2021. These visits were joint visits with Father and the child's mother. The observer took extensive notes and this court notes nothing negative about Father contained therein, except that occasionally the observer felt that the parents were not able to set limits. CYS Exhibit K is a packet of visitation records where only the child's mother was present. However, these records indicate that often Father was called during the visit and spoke with the child. These records also note that Father was in drug rehab in April, 2021. CYS Exhibit L consists of two records of visits labeled as Father's visits, however, the notes reflect that both parents were present. At trial, the CYS caseworker was unable to aver that Father missed visits, only that he had been late occasionally. *Id.* at 62. In addition to the CYS supervised visits, Father testified he visited with the child on weekends at the paternal grandfather's church, prior to the time when the child moved to Tennessee. *Id.* at 156, 257. There was some discussion at trial as to whether this was permitted by CYS, but the court finds Father credible that that these extra visits occurred. Moreover, the CYS caseworker testified that she was aware of these weekend visits with the grandfather. *Id.* at 67.

6

During incarceration at SCI-Somerset, Father sent the caseworker two letters requesting that visitation be set up. *Id.* at 24, 64. Visitation was not ultimately set up because Father was moved to SCI-Forest and the process had to begin anew. *Id.* at 27. Another delay was caused by Father's error in filling out paperwork. According to the CYS caseworker, Father began visitation with the child from SCI-Forest in December, 2022, prior to the filing of the TPR petition. *Id.* at 28. In contrast, Father testified, as discussed below, as to his phone calls to his child throughout his incarceration. Father admits that video visits were never successfully arranged during his incarceration. *Id.* at 215.

We find Father's testimony credible that he attempted to write and send gifts to the child during his incarceration. *Id.* at 197-98. The CYS caseworker testified as to her knowledge that Father also communicated with the child to some extent via phone calls to the Tennessee foster parents in the summer and fall of 2022. *Id.* at 38, 65, 87. The foster parents are encouraging and amenable to the child having contract with Father. *Id.* at 91-92, 104. Father also phoned the child via the paternal grandfather when the child attended church with his grandfather prior to the move to Tennessee. *Id.* at 215. Father reports that, notwithstanding incarceration, the longest period he has gone without any contact with the child is one month. *Id.* at 149. Since release from incarceration, Father enjoys Zoom visits and has also enjoyed in-person visits when the foster family travels north from Tennessee.

In summary, there is ample evidence of record that Father visited or attempted to arrange visitations throughout the entire period of the child's dependency.

### Stable Housing

The CYS caseworker testified that Father's residence at the home of the paternal grandfather is entirely suitable for the child. *Id.* at 40, 67. There is no evidence of record as to

7

when the home study was conducted. The child has a history of attending church with his paternal grandfather and visiting his grandfather in this home after church. *Id.* at 67. Father sold his own home and the money was used to pay off the fines and costs of his conviction. *Id.* at 180-81.

## Medical Appointments

The evidence of the agency on this aspect of the case plan is lacking, as the CYS caseworker was asked no questions on direct examination. The CYS caseworker admitted on cross-examination that Father attended all review hearings, whether incarcerated or not, and inquired as to the general condition of the child. *Id.* at 69. The agency was not privy to communications between Father and grandfather or foster parents, and so has no idea if Father has discussed the child's medical issues. Certainly, Father has never refused to sign a release, which might be required if the child had a significant health need such as surgery.

## Further Criminal Activity

Father has not engaged in further criminal activity since his arrest in August 2020 that was the cause of the dependency. *Id* at 69. During his incarceration, father had no disciplinary actions taken against him, nor parole violations since his release. *Id.* at 160, 164.

## Mental Health Assessment

Father testified that he attempted, but was unable to obtain a mental health evaluation while incarcerated. *Id.* at 226. Father views the Therapeutic Community program he completed as a drug and alcohol program with some mental health components. *Id.* at 219, 226. Father acknowledges, however, that CYS does not view the Therapeutic Community program as a mental health evaluation. *Id.*

While incarcerated, Father attended a number of courses that appear to have mental health components, although they are not clinical evaluations. *Id.* at 161. These programs are variously

titled, "Transformative Change," "Emotional Intelligence," "The Power of Patience, "Life and Leadership," "Properly Seeing Your Anger," and "What's Behind Your Emotions." These programs were completed between October 21, 2022 and November 18, 2022, prior to the filing of the TPR petition. Father's Exhibit 6. The programs were voluntary on Father's part and were not required for release. *Id.* at 181.

Following release, on September 3, 2023 Father obtained a mental health evaluation at Beal's Counseling and no further treatment was recommended. Father's Exhibit 3.

Finally, the court notes that Father's inpatient rehab in April 2021 likely involved some mental health components. Thus, there is sufficient evidence of record that although Father was denied a mental health evaluation while incarcerated, he attempted to work on mental health issues utilizing the recourse that were available to him.

### Financial Support and Budget

Father receives Social Security Disability of $1200 per month, and the child receives a separate check from Social Security as his dependent. *Id.* at 240, 244, 259; Father's Exhibit 7. There is no separate child support order in effect. *Id.* at 258. As Father received disability benefits prior to his arrest, the child was financially supported during the length of the dependency proceedings. Father owes a repayment to Social Security of $3,346. This may stem from the period of incarceration during which he was not entitled to a check but the child was, or it may stem from the child's mother's acts of fraud with respect to the benefits. *Id.* at 240. As indicated above, Father sold his home and used the proceeds to pay off his criminal fines and costs. The remaining proceeds of $5,000 were invested in a CD. Notwithstanding the CYS caseworker's testimony to the contrary, the court finds Father credible that he has regained his drivers' license and owns a vehicle. *Id.* at 52, 249, 251.

During incarceration, Father completed DOC's Pathway to Success Program, a 60-hour course designed to prepare inmates for career success upon release. Father completed the program on February 27, 2023. Father took the 10-hour "MoneySmart" re-entry program on April 4, 2023. Father also took a number of optional financial courses in prison, variously titled "Navigating the Financial Road of Investing," "Business Management 101," "Real Estate House Flipping," and "Money Sense." Father's Exhibit 6.

Father had not previously submitted a budget to CYS, but presented one as evidence at trial. Father's Exhibit 7. Father has no rent or utility obligation while he resides with his father, the child's paternal grandfather. Father is exploring employment opportunities. The CYS caseworker testified that she had discussed a budget with Father at some point prior to the hearing, wherein he shared with her how much Social Security he received but did not detail his expenses. *Id.* at 75. Nonetheless, there was no credible evidence to suggest that Father could not meet his ordinary expenses or those of the child.

### Drug and Alcohol Treatment.

During the period of bond release prior to sentencing, Father attended and successfully completed a 30-day inpatient rehab in April 2021 at Allegiance in South Fork. *Id.* at 126, 153-54, 203-04, 224, 261-62. Father was recommended for follow-up treatment. Father then began outpatient treatment at Twin Lakes but was kicked out for missing a meeting, possibly because of transportation issues. *Id.* at 262-64. As indicated above, Father was then sentenced in September, 2021.

While incarcerated at SCI-Somerset, Father successfully completed the Therapeutic Community program from February 8, 2022 to June 17, 2022. *Id.* at 34, 70, 101, 164, 219; Father's

10

Exhibit 1 (admitted without objection). The program consists of 129 sessions over four months.[2] Father's course evaluation notes recommended that Father receive a drug and alcohol evaluation upon parole. *Id.* at 224; Father's Exhibit 1. The CYS caseworker testified that she received a copy of his completion certificate from his counselor. *Id.* at 77. The completion date of June 17, 2022 is six months prior to the filing of the TPR petition, which was filed on January 19, 2023.

On June 14, 2023, within two weeks of his release, Father attended a drug and alcohol evaluation at New Visions, part of Conemaugh Medical Center. No treatment was recommended. Father's Exhibit 2, *Id.* at 227-28. This evaluation was forwarded to Father's parole officer and a screen shot was provided by Father to the CYS caseworker. The CYS caseworker testified that the agency is concerned about evaluations where it did not make the referral, such that the evaluation is based on a "self-report" with the potential for minimization of issues by the patient. *Id.* at 73, 79, 96-97. However, Father testified credibly that he had provided a comprehensive history to the counselor, including his CYS involvement, inpatient rehab treatment, failure to attend outpatient treatment before sentencing, completion of the Therapeutic Community program and the fact that he had been sober for three years. *Id.* at 228-231. Further, the CYS caseworker had a release for information to enable her to follow-up with the evaluator, but did not reach them. *Id.* at 105.

Father took and passed a drug test conducted by the agency on July 19, 2023, approximately six weeks after his release of June 3. *Id.* at 31, 157. A clean drug screen is a precursor to being permitted to participate in an approved parenting class. *Id.* at 31. Importantly, Father took another drug test at Beal's Counseling on September 8, 2023. *Id.* at 157. Father

---

[2] Inmates who participate in the TC program at a PA DOC prison go through three treatment phases (Orientation, Primary Treatment and Relapse Prevention and Aftercare) for approximately four months. Source: https://www.cor.pa.gov/About%20Us/Statistics/Documents/Reports/TC%20Evaluation%20June%202019.pdf (last accessed March 6, 2024). Our appellate courts have taken judicial notice of DOC policies that appear on its website. *See, e.g., DuBoise v. Rumcik,* 256 A.3d 508 (Table), 2021 WL 2026696, fn. 9 (Pa. Cmwlth. May 21, 2021).

11

submitted to drugs tests while incarcerated, particularly when transferred to a different facility. *Id.* at 159. Father has not failed a drug screen during the course of the dependency proceedings. CYS declined to test Father at any of his court hearings. *Id.* at 80.

As discussed above, Father was required to obtain a follow-up drug evaluation upon parole and did so, eleven days later. But his treatment was substantially completed as of June 17, 2022. Thus, there is ample evidence of record that Father substantially complied with this component of his case plan more than six months prior to the filing of the TPR petition.

## Bonding Study

Carol Patterson testified as an expert in bonding and attachment. *Id.* at 110. She conducted a two- hour observation of Father on August 3, 2023. Patterson noted several positives of the Father's visits, namely, 1) Father provided snacks, 2) Father positively reinforced the child, 3) the child did not exhibit behavioral concerns, and 4) the child was compliant with Father. *Id.* at 114, 135, 138. Importantly, the child recognizes his father and initiated a hug. *Id.* at 115, 135. Patterson agreed with Father's counsel that Father did appropriate things during the study. *Id.* at 135. Patterson was displeased that the child did not ask questions about his father's life, but she admitted that "there weren't a lot of negative factors involved" in the observation. *Id.* at 115. Patterson opined that a bond was not formed during the formative years of child's life based on her understanding of the parents' history. *Id.* at 117. Further, she opined that a physical absence of 1 ½ years impacts the child's relationship with Father. *Id.* at 118. Also, she opined that the child would have sought out his maternal grandparents (first placement) initially and then the maternal uncle in Tennessee (second placement) as the people who will take care of him. *Id.* at 119. Finally, Patterson believes the child will continue to believe he belongs with his maternal uncle's family. *Id.* at 120.

12

The courts finds Patterson credible in her opinion that, in general, a child will form a bond with the person who is presently providing for his needs. The court finds Patterson not credible, however, to the extent she was unwilling to consider, based on numerous visitation reports that she reviewed, that Father had a bond with the child prior to his incarceration. *Id.* at 123, 134-35. The court further questions the assumption on which Patterson's opinion was based. Patterson was informed by the agency prior to her study that "Brydon's parents' . . . contacts with [the child] had been very inconsistent." Exhibit O; *Id.* at 124. This assumption, baked into Patterson's opinion, is not supported by the evidence at trial.

Finally, the court does not find Patterson credible to the extent that she is inferring that a child may have only one bond at a time or that the bond with Father cannot be strengthened. The evidence is uncontroverted that the child knows who Father is, refers to Father as "Dad" and that the foster parents take pains to keep this role clear in the child's mind.

## Conclusion

The court takes note of the efforts Father made to improve himself during his incarceration. In addition, Father made efforts to remain in contact with child, and did so, despite the limitations or failures of the inmate visitation process. During the course of the dependency, Father reported to the agency that he wanted his child back and wanted to be in his life. *Id.* at 87-88.

Upon release on June 3, 2023, either Father contacted the agency, or the foster parents contacted the agency, to notify it of Father's release. In reconciling the inaccurate testimony of the CYS caseworker and Carol Patterson regarding Father's release date, the court finds the agency was likely notified of the release within the same month, albeit not aware of where he was living. *Id.* at 31, 37. Certainly, it is undisputed that Father began his efforts to complete his case plan in June 2023 when he undertook a drug and alcohol evaluation at New Visions. The court finds

13

Father's testimony credible that, upon his release, the CYS caseworker provided him with a written list of tasks that still needed to be completed, notwithstanding that the TPR petition had been filed six months earlier. *Id.* at 192, 194, 239. Father was under the impression that the main goals he needed to accomplish at that point were parenting and mental health. *Id.* at 192. A CYS employee visited Father's home to demonstrate how to access his parenting class on the computer. *Id.* at 172, 213. Father could reasonably have believed that he would be allowed to complete his case plan and avoid the termination of his parental rights. But at trial, the agency took the position that none of Father's efforts mattered once the TPR petition had been filed in January, 2023.

The court has no doubt that the child is comfortable and happy in the care of his relative foster parents. The court notes that the agency did not submit into evidence the bonding study done with the foster parents, although Patterson somewhat addressed it in her testimony. Nonetheless, prior to considering the best interest of the child, the court in a TPR proceeding must find that the agency clearly and convincingly met its burden of proof with respect to grounds for termination. *In re: B., N.M., supra,* at 859 ("The needs and welfare of a child are essential considerations but bifurcated from and not relevant to the proof of the statutory requirement for termination of parental rights, which must be established before the child's needs and welfare are considered.").

Here, the court finds that grounds have not been met under sections (a)(1), (a)(2), (a)(5), or (a)(8). As to (a)(1), Father has not evidenced an intent to relinquish his rights, nor refused to perform parental duties. As to (a)(2), the evidence does not show, by a clear and convincing standard, that "the cause of the incapacity, abuse, neglect or refusal" has not been remedied by Father. As to (a)(5), the evidence does not show, by a clear and convincing standard, that "the conditions which led to the removal or placement of the child continue to exist, the parent cannot

14

or will not remedy those conditions within a reasonable period of time." As to (a)(8), the evidence does not show, by a clear and convincing standard, that "the conditions which led to the removal or placement of the child continue to exist."

The agency relies on 25 Pa.C.S. §2511(b) which provides that, in cases of termination under subsections (1) or (8), the court shall not consider any efforts by the parent to remedy the conditions that are initiated subsequent to the giving of notice of the filing of the TPR petition. In this, the court finds adequate support in the record that Father *initiated all essential activities in his case plan* prior to the filing of the TPR petition. Further, Father has never refused to provide a release, nor refused a drug test. Father attended his review hearings. The agency has no positive drug screens on Father. Father made every opportunity to visit and call his child. Father's housing is suitable.

A strict interpretation of § 2511(b) would create a blanket rule punishing inmates who may not have access to all services in their case plans while incarcerated, whereas the case law pertaining to incarcerated parents facing TPR requires the court to look at efforts made while incarcerated, as well as whether there is a clear path forward following incarceration. This case is remarkably similar to the facts of *In re: RIS, supra,* as follows:

> The trial court found that Father has done everything possible for him to do regarding his responsibility as a father while incarcerated; the record included evidence that Father has maintained contact with and cooperated with CYS, has participated in hearings and meetings via telephone, has consistently requested information from CYS as to the welfare of the children, completed a program while incarcerated, sent cards to the children on a monthly basis sent a video of himself reading a book to the children, requested visits with the children which were denied by CYS, and attempted to call the children from prison.

*Id.* at 571. For that reason, in the instant case termination of Father's parental rights was properly denied by the court.

The court notes that the agency in its Statement of Matters argues that the court erred in

15

admitting some of Father's exhibits, such as his mental health evaluation, final drug and alcohol evaluation, and the coursework taken while incarcerated. These exhibits serve merely to bolster Father's testimony that he undertook and completed these items for purposes of case plan compliance. The decision of whether to admit or exclude evidence is within the sound discretion of the orphans' court. *In re: A.J.R.-H.* 188 A.3d 1157, 1166-67 (Pa. 2018). In any event, the court is not unduly relying on these exhibits, as it finds Father's testimony credible as to the efforts he made to complete his case plan. Moreover, the burden of proof never shifted to Father; the agency was always required to prove by clear and convincing evidence that Father failed to remedy the conditions leading to the child's dependency.

Finally, the court notes that this decision does not mean that the child will be immediately ripped from the care of his foster parents. It means only that Father has retained his parental rights for the time being and he continues to have the right and opportunity to strengthen the bond and gradually spend more time with the child. The child remains a dependent child who is in the legal and physical custody of CYS, and other permanency arrangements may be available. Moreover, if the agency wishes to require a mental health evaluation or drug and alcohol evaluation that is not a self-report, it may condition additional visitation on Father undertaking such evaluations.

Therefore, the court respectfully requests that the Superior Court affirm this Court's December 20, 2023 Order.

RESPECTFULLY SUBMITTED:

DATE: March 14, 2024

Scott P. Bittner, President Judge

Certified to be a true and correct copy of the original Document on file in this office.

K. Ackerman

Sharon K. Ackerman
Register of Wills &
Clerk of Orphans' Court

16