J-S01017-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF G.J.W., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: D.K., FATHER | : : : : : : : | |
| | : | No. 1551 MDA 2024 |

Appeal from the Decree Entered October 4, 2024
In the Court of Common Pleas of Cumberland County Orphans' Court at
No(s):  055-ADOPT-2023

BEFORE:   NICHOLS, J., KING, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY KING, J.:                    **FILED: FEBRUARY 11, 2025**

Appellant, D.K. ("Father"), appeals from the decree entered in the Cumberland County Court of Common Pleas, granting the petition of Appellees, A.S. ("Maternal Aunt") and S.S. ("Maternal Uncle"), for involuntary termination of Father's parental rights to his minor child, G.J.W. ("Child").  We affirm.

The relevant facts and procedural history of this case are as follows. Child was born in February of 2017; A.E.[1] ("Mother") and Father are Child's birth parents.  Father was incarcerated at the time of Child's birth.  Father was convicted of third-degree murder, endangering the welfare of children, and simple assault, in connection with the death of his daughter, who was Child's

_____

[*] Former Justice specially assigned to the Superior Court.

[1] Mother is also referred to as A.W. in various filings and during testimony, reflecting her maiden name.

half-sibling. Father is serving an aggregate sentence of 22 to 45 years' imprisonment and has been incarcerated for the duration of Child's life. Mother died from liver failure in July of 2023. Child began living with Maternal Aunt and Maternal Uncle after Mother's death. On October 5, 2023, Maternal Aunt and Maternal Uncle filed a petition to involuntarily terminate Father's parental rights to Child and to adopt Child. The trial court held a hearing on September 16, 2024.

Maternal Aunt testified that Child began living with her and Maternal Uncle in September of 2023 after Mother's death. She was present when Child was born and has had a relationship with Child throughout her life. For approximately the first year of Child's life, Maternal Aunt watched Child every Saturday. After that point, Maternal Aunt would babysit Child when asked and see Child on holidays. Maternal Aunt testified that Child is doing well in their care and is well bonded with everyone in their house, including her two stepsons. Maternal Aunt noted that when Child first came to live with them, she was introverted, wary of adults, and did not like hugs. In the time that Child has been living in Maternal Aunt and Maternal Uncle's care, Child has become warmer, more outgoing, and overall "a happy-go-lucky kid." Child is doing well in school and has many friends. Child is also enrolled in soccer and enjoys participating in the kids' bible school at their church.

Since Child has come to live with them, Maternal Aunt and Maternal Uncle have attended to all of Child's needs, including her meals, education, physical and mental health, etc. Maternal Aunt and Maternal Uncle also

financially support Child. In that time, Child has not received any letters, cards or support from Father. They have also not received anything for Child from others on Father's behalf. Child is aware that Father is in prison and has not asked to visit him. Maternal Aunt testified that she wants to terminate Father's parental rights because she thinks Child is too young to navigate the emotional turmoil of having a relationship with Father when he is incarcerated for the death of her half-sibling.

On cross-examination, Maternal Aunt testified that she is aware that Mother took Child to visit Father in prison prior to her death but she has no knowledge of whether Child and Father maintained contact by phone or video call. She further testified that she is aware that Child regularly spent time with her paternal grandparents prior to Mother's death. Since Child has started to live with her, Maternal Aunt has not allowed any contact between Child and the paternal grandparents because she believes that the paternal grandparents drink heavily, and she is concerned about Child being around that lifestyle. When Child first moved into her residence, her paternal grandparents would call and text regularly but since January of 2024, they have not contacted her. She further acknowledged that she and Maternal Uncle had some financial difficulties in the past year and Maternal Uncle filed for bankruptcy.

Maternal Uncle testified that he is currently on leave from work because he had to have two back surgeries. Maternal Uncle's employer is holding his position for him so that he can return after he is recovered. Maternal Uncle

filed for bankruptcy because of mounting credit card and medical debt. The bankruptcy was finalized approximately a year ago. Maternal Uncle did not have a relationship with Child before she moved into their house. Since then, Maternal Uncle and Child have bonded and they spend significant time together, talking and watching television shows. He often supports Child emotionally when she gets upset at night. Maternal Uncle further testified that he and Maternal Aunt currently meet all of Child's financial needs and are prepared to continue to do so in the future.

M.M. ("Paternal Grandmother") testified that she has been involved in Child's life since she was born. Paternal Grandmother watched Child every day after school prior to Mother's death and has a strong bond with Child. During this time, Paternal Grandmother, Child, and Mother would regularly have video calls with Father. During these calls, Child would talk to Father about her life and referred to him as dad. Child was aware that Father was in prison, but they did not discuss the details of Father's conviction with Child. Child went to visit Father in prison on one occasion. Paternal Grandmother approximated that the last time that Child had a video call with Father was in May of 2023. Since Child has moved in with Maternal Aunt and Maternal Uncle, Paternal Grandmother has not had any contact with Child. Paternal Grandmother has repeatedly tried to reach out to Maternal Aunt to maintain a relationship with Child, but Maternal Aunt has not been receptive. Paternal Grandmother testified that she and her husband do not abuse drugs or alcohol. Paternal Grandmother stopped drinking in March of 2023 due to

health concerns. During cross-examination, Paternal Grandmother acknowledged that Mother had a serious alcohol problem that likely led to her death. Paternal Grandmother further admitted that on many occasions, she drank alcohol and smoked marijuana with Mother.

Father testified that he is currently incarcerated, serving a sentence of 22 to 45 years' imprisonment. The date on which he would reach his minimum sentence is June 1, 2038. Prior to Mother's death, Father had a good relationship with Mother, and Mother helped facilitate a relationship between Father and Child. Father had one in-person visit with Child at the prison, where he was able to hug and play with Child. Father would have three or four video calls with Child per month. During these calls, Child called him dad and they would talk about her life. The last video call that he had with Child was in May of 2023, after which Mother became very ill and could no longer facilitate the video calls. Father would also regularly talk to Child on the phone when he called Mother or his parents. Father testified that through these interactions, he formed a loving bond with Child. Since Child has been in Maternal Aunt's care, Father asked Paternal Grandmother to contact Maternal Aunt to maintain contact with Child. On cross-examination, Father testified that he has not written letters or cards to Child while Child has been in Maternal Aunt's care. Father stated that he did not have Maternal Aunt's address but acknowledged that he also did not give Paternal Grandmother letters or cards to give to Child.

The court interviewed Child, who was seven years old at the time of the

hearing. Child stated that she likes living with Maternal Aunt and Maternal Uncle and would like to continue living there. Child stated that she calls them aunt and uncle but referred to them as mom and dad several times while talking to the court. Child clarified that although she does not call them mom and dad, she refers to them as mom and dad if she is speaking about them to others. When asked about her biological dad, Child identified Father's first name. Child stated that she has not seen him since she moved in with Maternal Aunt and Maternal Uncle. Child further stated that she has not received letters or phone calls from Father.

Child's legal counsel informed the court that she spoke with Child on two occasions. Counsel noted a big difference in Child's demeanor from the first visit to the more recent second visit. Child was more outgoing and confident during the second visit. Child understood what was being determined at the termination proceedings. Child indicated that she wants to be adopted by Maternal Aunt and Maternal Uncle and remain in their care. Child uses Maternal Aunt and Maternal Uncle's last name as her own at school. When asked about Father, Child did not have a great memory of him. The guardian *ad litem* ("GAL") also opined that termination of Father's parental rights is in Child's best interests due to Child's emotional vulnerability and need for stability with her primary caregivers.

On October 4, 2024, the court granted the petition to involuntarily terminate Father's parental rights to Child, finding that termination was

appropriate under 23 Pa.C.S.A. § 2511(a)(9)(i)[2] and (b).[3]  On October 24, 2024, Father timely filed a notice of appeal and a contemporaneous concise statement of matters complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i).

Father raises the following issue for our review:

> Did the court err and/or abuse its discretion in its decision to terminate [Father's] parental rights because the evidence did not support a finding that said termination best serves the needs and welfare of the child at issue pursuant to 23 Pa.C.S.A. § 2511(b)?

(Father's Brief at 11).

On appeal, Father concedes that grounds were present to terminate his parental rights to Child rights under Section 2511(a), but he argues that the court erred in determining that termination was in Child's best interest under Section 2511(b).  Father asserts that Maternal Aunt and Maternal Uncle had limited contact with Child until she began living with them.  Father claims that he fostered a loving bond with Child while he was incarcerated through video and phone calls, evidenced by the fact that Child refers to him as "dad."  Father contends that Child is also strongly bonded with his parents and extended family, who she saw almost every day prior to Mother's death.

---

[2] Section 2511(a)(9)(i) provides that the rights of a parent over a child may be terminated if the parent has been convicted of criminal homicide where the victim was a child of the parent.  **See** 23 Pa.C.S.A. § 2511(a)(9)(i).

[3] The court also terminated the parental rights of Child's putative father, who did not participate in the termination proceedings and is not party to this appeal.

Father insists that terminating his parental rights would destroy the important and beneficial relationships that Child has with Father and his family members, resulting in emotional damage to Child, who has already lost her mother. Father concludes that the court abused its discretion in finding that Child's needs and welfare are best served by termination of Father's parental rights, and this Court should vacate the termination decree. We disagree.

Appellate review in termination of parental rights cases implicates the following principles:

> In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. This standard of review corresponds to the standard employed in dependency cases, and requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but it does not require the appellate court to accept the [trial] court's inferences or conclusions of law. That is, if the factual findings are supported, we must determine whether the trial court made an error of law or abused its discretion. An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion; we reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill will. Thus, absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. However, [w]e must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re Adoption of C.M.*, 667 Pa. 268, 294-95, 255 A.3d 343, 358-59 (2021)

(internal citations and quotation marks omitted).

If the court determines that there are grounds to terminate parental rights under Section 2511(a), the court must "engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child." *In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007). Section 2511(b) provides, in relevant part:

> **§ 2511. Grounds for involuntary termination**
>
>          \*     \*     \*
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.
>
>          \*     \*     \*

23 Pa.C.S.A. § 2511(b).

Under Section 2511(b), the court must consider whether termination will meet the child's needs and welfare. *In re C.P.*, 901 A.2d 516, 520 (Pa.Super. 2006). "Intangibles such as love, comfort, security, and stability are involved when inquiring about the needs and welfare of the child. The court must also discern the nature and status of the parent-child bond, paying close attention to the effect on the child of permanently severing the bond." *Id.* (internal citations omitted). "In this context, the court must take into account whether a bond exists between child and parent, and whether

termination would destroy an existing, necessary and beneficial relationship."

***In re Z.P.***, 994 A.2d 1108, 1121 (Pa.Super. 2010).

"Each case of an incarcerated parent facing termination must be analyzed on its own facts, keeping in mind … that the child's need for consistent parental care and stability cannot be put aside or put on hold[.]" ***Interest of K.M.W.***, 238 A.3d 465, 474 (Pa.Super. 2020) (*en banc*) (quoting ***In re E.A.P.***, 944 A.2d 79, 82-83 (Pa.Super. 2008)). "The focus is on whether the parent utilized resources available while in prison to maintain a relationship with his or her child. An incarcerated parent is expected to utilize all available resources to foster a continuing close relationship with his or her children." ***In re B., N.M.***, 856 A.2d 847, 855 (Pa.Super. 2004), *appeal denied*, 582 Pa. 718, 872 A.2d 1200 (2005) (internal citations omitted).

Additionally:

> The Section 2511(b) inquiry must also include consideration of other important factors such as: the child's need for permanency and length of time in foster care…; whether the child is in a preadoptive home and bonded with foster parents; and whether the foster home meets the child's developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety, and stability. These factors and others properly guide the court's analysis of the child's welfare and all her developmental, physical, and emotional needs. … Trial courts have the discretion to place appropriate weight on each factor present in the record before making a decision regarding termination that best serves the child's specific needs.

***Interest of K.T.***, ___, Pa. ___, ____, 296 A.3d 1085, 1113 (2023) (footnote omitted).

Instantly, the court explained its determination as follows:

> [The court] considered the needs and welfare of [Child], pursuant to [Section] 2511(b), and find[s] it is in her best interests to terminate the parental rights of [Father]. In making this determination, [the court] considered that [Child] has been through much trauma and disturbance of stability by the death of her mother, the death of her half-sibling (the victim of [Father's] convictions), and the resultant imprisonment of [Father] to incarceration for not less than 22 years. [The court] considered that [Child] desperately needs stability and peace to overcome all she has endured, and all she has lost, thus far in her young life. [The court] considered that she feels at home and loved by [Maternal Aunt and Maternal Uncle], that she will continue to have communication with her mother's extended family, and that she already considers herself to be a member of the [Maternal Aunt and Maternal Uncle's] family[.]
>
> [The court] further considered that terminating the parental rights of [Father] will not destroy a necessary or beneficial parental bond, given that [Child] barely knows him, has not seen him in quite some time, and had difficulty telling [the] [c]ourt his first name. [Father] has not been present in [Child's] life for most of her life and has been incarcerated since before her birth. [The court] did consider, and lament, that terminating his parental rights necessarily terminates the legal rights of his extended family. It was evident from the testimony of his family at the hearing that they love [Child] and wish to be a resource for her. [The court] note[s that] they also agreed at the time [Child] began living with [Maternal Aunt and Maternal Uncle] that such home was the best place for [Child] to gain stability. [The court] wish[es] for [Maternal Aunt and Maternal Uncle], in consultation with [Child's] therapist, to allow for contact between the paternal extended family and [Child] so that Child may receive the benefit of knowing that family and any help they can provide for her[.] [However, the court] ultimately found that the home of [Maternal Aunt and Maternal Uncle] will best meet [Child's] developmental, physical and emotional needs and welfare[.]

(Termination Order and Opinion, filed 10/4/24, at 3-4) (paragraph numbers

omitted).

The record supports the court's findings. **See In re Adoption of C.M., supra**. Child has been living with Maternal Aunt and Maternal Uncle since September of 2023. Maternal Aunt testified that Child is happy and thriving in their care and they are meeting all her needs. Child is doing well in school, has many friends, and participates in extra-curricular activities. Additionally, Maternal Aunt and Maternal Uncle have been Child's primary source of emotional support and stability since the death of her mother. Maternal Aunt indicated that Child has made progress in processing her trauma while in their care. Child is happier, warmer, and more outgoing than when she first came to stay with them. Child's legal counsel echoed these sentiments, noting that Child was more outgoing and confident during the second meeting she had with Child. Additionally, the record demonstrates that Child has formed a strong bond with Maternal Aunt and Maternal Uncle. Child refers to them as mom and dad when speaking about them to others. Child uses their last name as her own in school. Child also told her legal counsel and the court that she is happy living with Maternal Aunt and Maternal Uncle and would like to be adopted by them.

The record further supports the court's conclusion that terminating Father's parental rights would not destroy a necessary or beneficial parental bond. Child has only seen Father in person on one occasion and has not spoken to Father since Mother's death. Maternal Aunt testified that Child has

not asked to visit Father while in their care. Child's legal counsel also stated that Child did not remember Father well. Additionally, Father was convicted of third-degree murder in connection with the death of Child's half-sibling, which is likely to add emotional turmoil to Child's life. Despite any bond that remains between Child and Father or Father's extended family, the court ultimately determined that Child's needs and welfare are best served by fostering permanency and stability for Child in Maternal Aunt and Maternal Uncle's care. *See Interest of K.T., supra*; *Interest of K.M.W., supra*. On this record, we cannot say the court abused its discretion in concluding that termination of Father's parental rights is in Child's best interest under Section 2511(b). *See In re Adoption of C.M., supra*. Accordingly, we affirm.

Decree affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 02/11/2025